Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

DANIELLE MILLER, derivatively on behalf of PETCO HEALTH AND WELLNESS COMPANY, INC.,

     Plaintiff,

     v.

JOEL D. ANDERSON, R. MICHAEL MOHAN, RONALD V. COUGHLIN, JR., SABRINA SIMMONS, BRIAN LAROSE, MICHAEL NUZZO, CAMERON BREITNER, GARY BRIGGS, NISHAD CHANDE, CHRISTOPHER STADLER, MARY SULLIVAN, and CHRISTY LAKE,

     Defendants,

     and

PETCO HEALTH AND WELLNESS COMPANY, INC.,

     Nominal Defendant.

Case No.: '25 CV 1985 RBM SBC

**DEMAND FOR JURY TRIAL**

1
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Danielle Miller ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Petco Health and Wellness Company, Inc. ("Petco" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Joel D. Anderson ("Anderson"), R. Michael Mohan ("Mohan"), Ronald V. Coughlin, Jr. ("Coughlin"), Sabrina Simmons ("Simmons"), Brian LaRose ("LaRose"), Michael Nuzzo ("Nuzzo"), Cameron Breitner ("Breitner"), Gary Briggs ("Briggs"), Nishad Chande ("Chande"), Christopher Stadler ("Stadler"), Mary Sullivan ("Sullivan"), and Christy Lake ("Lake") (collectively, the "Individual Defendants", and together with Petco, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Petco, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Anderson, Mohan, Coughlin, Simmons, LaRose, and Nuzzo for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Petco, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from January 14, 2021 through June 5, 2025,

inclusive (the "Relevant Period").

2.     Petco describes itself as a "pet specialty retailer" which does business as a "fully-integrated, omnichannel provider of pet products, services and solutions." The Company's retail business sells various national, owned brand, and exclusive merchandise, and aims to provide health-focused and premium products which, importantly, it considers a growth driver positioned to exploit current "trends in pet humanization and premiumization." The Company also operates three hundred full service veterinary hospitals, complemented by prescription and insurance offerings, as well as over 1,500 Vetco veterinary clinics as of February 1, 2025. In addition, the Company operates 142 pet care centers in Mexico, as well as two in Chile, through a joint venture.

3.     Coming out of the COVID-19 pandemic (the "Pandemic"), Petco repeatedly touted the gains it had made in terms of both growth and profitability, based in large part on tailwinds related to the Pandemic, including comparable sales growth. This was of great importance to Petco since the Company looks to comparable sales when measuring its performance (also known as same-stores sales or "comp"). This metric measures the change in period-over-period net sales from physical locations and digital sites over a given period. During the Pandemic, the Company experienced a marked increase in its comparable sales growth, largely due to an increase in pet adoption rates.

4.     Petco touted these admittedly positive trends to investors not as the short-term gains that they were, but instead as being indicative of sustainable, long-term growth at the Company. Additionally, in keeping with this characterization of such Pandemic tailwinds, Petco consistently boasted of its purported transformation from a general pet retailer into a health-focused pet company. Additionally, Petco attempted to capitalize on what it described as ongoing trends in "pet humanization" and "premiumization." Indeed, Petco painted these as durable trends driven by younger consumers transferring their generally higher health-consciousness into their pet-related purchases. Furthermore, the Company represented that it was well positioned to capitalize on these trends to drive sustainable and

profitable growth centered around products including but not limited to artificial ingredient-free pet food lines.

5. However, the Pandemic tailwinds eventually ceased blowing. Consequently, and contrary to Petco's prior representations, the profitability and sales metrics for the Company began to experience a rapid downturn. As early as the middle of 2023, the Company's faltering financial performance was apparent. Despite this, Defendants continued to make public statements designed to give the impression that their healthy, premium pet food business model remained a viable, sustainable business strategy. For example, in a March 2023 press release wherein Petco issued financial guidance for its fiscal year 2023,[1] the Company included adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") of $520 to $540 million and adjusted earnings per share ("EPS") of $0.40 to $0.48. Defendants reaffirmed this guidance subsequently in May 2023, despite having full awareness of the Company's decreasing financial health.

6. On August 24, 2023, the Company issued a press release announcing its financial results for the second quarter of Fiscal Year 2023 (the "Q2 2023 Press Release"). The Q2 2023 Press Release included a negative adjustment to Petco's EBITDA guidance, shrinking it significantly from a range of $520-$560 million to $460-$480 million. Nonetheless, the Individual Defendants continued to emphasize to the investing public that Petco's healthy, premium pet food strategy was viable. Moreover, following the issuance of the Q2 2023 Press Release, Petco began to experience a long series of precipitous stock drops and resignations within senior leadership, including Defendant Coughlin stepping down as the Chief Executive Officer ("CEO"), Chairman, and as a member of the Company's Board; the termination of the Company's Chief Customer Officer; and the

---

[1] Petco's fiscal year ends on various dates between January and early February. For the period of time between January 31, 2021 and January 29, 2022, "Fiscal Year 2021." For the period of time between January 30, 2022 and January 28, 2023, "Fiscal Year 2022." For the period between January 29, 2023 and February 3, 2024, "Fiscal Year 2023." For the period between February 4, 2024 and February 1, 2025, "Fiscal Year 2024." For the period of time between February 2, 2025 and February 1, 2026, "Fiscal Year 2025."

stepping down of Defendant LaRose as Chief Financial Officer ("CFO"), all while the Individual Defendants continued to mislead the investing public.

7.    The truth fully emerged on June 5, 2025 when the Company issued a press release announcing its financial results for the first quarter of Fiscal Year 2025 (the "Q1 2025 Press Release"). Among other things, the Q1 2025 Press Release reported a 1.3% year-over-year decline in comparable sales, which was more than double Wall Street's 0.6% estimate.

8.    On this news, the price per share of the Company's common stock fell from $3.62 to $2.78 per share, a 23.2% single-day decrease.

9.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) Petco's Pandemic-related tailwinds were unsustainable; (2) Petco's premium/high-grade pet food business model was likewise unsustainable; (3) the scope and severity of the foregoing was such that mitigation and correction would be very expensive and thus negatively impact Petco's sale metrics; (4) Petco's ability to deliver sustainable and profitable growth was overstated; and (5) as a result of the foregoing, the Individual Defendants' public statements were materially false and/or misleading at all relevant times.

10.    In addition, during the Relevant Period, four of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock was artificially inflated as a result of the Individual Defendants' false and misleading statements discussed herein, reaping combined total proceeds of approximately $6.93 million.

11.     In light of the Individual Defendants' misconduct, which has subjected the Company and its current CEO, CFO, and several former executive officers to a federal securities fraud class action lawsuit pending in the Untied States District Court for the Southern District of California (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

12.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

13.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of the liability of Defendants Anderson, Mohan, Coughlin, Simmons, LaRose, and Nuzzo in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. §§ 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

15.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

18.    Plaintiff is a current shareholder of Petco. Plaintiff has continuously owned Petco common stock at all relevant times.

### Nominal Defendant Petco

19.    Petco is a Delaware corporation with its principal executive offices at 10850 Via Frontera, San Diego, California 92127. Petco's common stock trades on the N ASDAQ under the ticker symbol "WOOF."

### Defendant Anderson

20.    Defendant Anderson has served as the Company's CEO and as a Company director since July 29, 2024.

21.    The proxy statement which the Company filed on Form 14A with the SEC on May 30, 2025 (the "2025 Proxy Statement") stated the following about Defendant Anderson:

> Joel Anderson has served as our Chief Executive Officer and a member of our board of directors since July 2024. Mr. Anderson is a highly accomplished retail leader with over 30 years of industry experience and a proven track record of value creation as a public company Chief Executive Officer. He brings deep operational discipline, merchandising skills, and branding expertise and has a passion for leadership development while building strong

cultural tenets. Most recently, Mr. Anderson served as the Chief Executive Officer of Five Below, Inc., a publicly traded retail company, from 2015 to 2025. Mr. Anderson previously served as the President and Chief Executive Officer of Walmart.com, an online shopping platform for the retail corporation, from 2011 to 2014, and for four years before that as divisional Senior Vice President of the Northern Plains division of Walmart stores, overseeing over 100,000 associates and more than $25 billion in annual sales. Mr. Anderson currently serves as a director and chairperson of the compensation committee of Sprouts Farmers Market, a supermarket chain. His extensive experience in retail and as a public company executive qualifies him to serve on our board of directors.

**Defendant Mohan**

22.     Defendant Mohan has served as a Company director since March 2021 and additionally serves as the current Chairman of the Compensation Committee. Previously, Defendant Mohan was the Company's interim CEO from March 13, 2024 to July 29, 2024 and served as the Company's Lead Independent Director from July 2021 until March 2024.

23.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Mohan made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
| --- | --- | --- | --- |
| June 13, 2024 | 48,026 | $3.58 | $171,933 |
| July 8, 2024 | 8,590 | $3.48 | $29,893 |
| July 15, 2025 | 48,026 | $3.48 | $164,729 |

Thus, in total, before the fraud was exposed, Defendant Mohan sold 104,642 shares of Company stock on inside information, for which he received approximately $366,555 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

24.     The 2025 Proxy Statement stated the following about Defendant Mohan:

Mike Mohan has served as a member of our board of directors since March 2021. He previously served as Petco's Interim Chief Executive Officer from March 2024 to July 2024 and as Lead Independent Director from July 2021 to March 2024. Prior to joining Petco, Mr. Mohan served as President and Chief Operating Officer of Best Buy Co., Inc., a consumer electronics retailer, from June 2019 to July 2021, where he was responsible for the operations of the company's U.S. and International businesses. From 2004 to June 2019, he served in various leadership roles at Best Buy, overseeing services, customer experience, category management, merchandising, marketing, and supply chain functions. Prior to joining Best Buy, Mr. Mohan was Vice President and General Merchandising Manager for Good Guys, an audio-video specialty retailer. Mr. Mohan also previously worked at Future Shop in Canada from 1988 to 1997, prior to Best Buy's acquisition of the company, where he served in various merchandising roles. Mr. Mohan also serves as Chairman of the board of directors of Bloomin' Brands, Inc., a casual dining restaurant company, and serves on the board of directors of Jackson Family Wines, a family-run wine company. He also served on the board of directors of VIZIO Holding Corp., a consumer electronics company, from February 2023 to December 2024 when VIZIO was acquired by Walmart. His extensive retail industry and management experience, coupled with his digital marketing acumen, qualifies him to serve on our board of directors.

**Defendant Coughlin**

25.    Defendant Coughlin served as the Company's CEO from June 2018 until March 13, 2024, and additionally as a Company director from 2018 until March 13, 2024.

26.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Coughlin made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| January 13, 2022 | 28,066 | $18.99 | $532,973 |
| March 17, 2022 | 137,723 | $19.30 | $2,658,054 |
| July 13, 2022 | 17,044 | $15.06 | $256,683 |
| January 13, 2023 | 17,697 | $10.57 | $187,057 |
| April 6, 2023 | 34,019 | $9.42 | $320,459 |

| July 13, 2023 | 17,044 | $9.49 | $161,748 |
| October 26, 2023 | 17,974 | $2.34 | $58,236 |
| January 16, 2024 | 20,756 | $2.86 | $59,362 |

Thus, in total, before the fraud was exposed, Defendant Coughlin sold 290,323 shares of Company stock on inside information, for which he received approximately $4,234,572 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

27.    The proxy statement which the Company filed on Form 14A on May 12, 2023 with the SEC (the "2023 Proxy Statement") stated the following about Defendant Coughlin:

> Ron has served as our CEO since June 2018. He was also appointed to serve as Chairman of our board of directors in January 2021 in connection with our initial public offering. Prior to that time, he served as one of our directors since June 2018. Prior to joining us, Mr. Coughlin served from 2014 to 2018 as President of the Personal Systems segment of HP Inc. (then-Hewlett-Packard Company), a $33 billion global business that offers consumer and commercial products and services. Previously, he served as Senior Vice President of Consumer PCs, Senior Vice President of LaserJet Hardware and Commercial Document Services and Solutions, and Senior Vice President of Sales, Strategy, and Marketing at HP. Prior to joining HP in 2007, Mr. Coughlin spent 13 years at PepsiCo in a range of senior executive roles, including Chief Marketing Officer of Tropicana and PepsiCo International Beverages. Mr. Coughlin earned a bachelor's degree in international marketing from Lehigh University and a master's degree in business administration from the Kellogg School of Management at Northwestern University. His in-depth knowledge of the issues, challenges, and opportunities facing us and his extensive operational, executive, and technology experience qualifies him to serve on our board of directors.

**<u>Defendant Simmons</u>**

28.    Defendant Simmons has served as the Company's CFO since February 17, 2025. Defendant Simmons also served as a Company director from 2021 until February 2025.

29.    The 2025 Proxy Statement stated the following about Defendant Simmons:

**Sabrina Simmons** has served as our Chief Financial Officer ("CFO") since February 2025. Ms. Simmons served as a member of Petco's Board of Directors and Audit Chair from 2021 until voluntarily resigning to become CFO. Prior to joining us, she served as Executive Vice President and Chief Financial Officer of Gap, Inc. until 2017. She also served in the following positions at Gap: Executive Vice President, Corporate Finance; Senior Vice President, Corporate Finance and Treasurer; and Vice President and Treasurer. Ms. Simmons currently serves on the Board of Directors of Columbia Sportswear Company, an outdoor apparel and equipment company, as well as the Board of Directors and Audit Committee of Coursera, Inc., an online learning platform, and previously served on the Board of Directors of Williams-Sonoma Inc., a kitchenware and home furnishings company, and e.l.f. Beauty, Inc., a cosmetics brand. She holds a bachelor's degree from the Haas School of Business at University of California, Berkeley and a master's degree in business administration from the Anderson School at UCLA. Ms. Simmons is also a CPA (inactive) in the state of California.

**Defendant LaRose**

30.    Defendant LaRose served as the Company's CFO from August 19, 2021 until February 17, 2025. Prior to serving as the CFO, Defendant LaRose served as the Company's Senior Vice President, Finance.

31.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant LaRose made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| January 13, 2022 | 3,644 | $18.99 | $69,200 |
| July 13, 2022 | 1,554 | $15.06 | $23,403 |

| | | | |
|---|---|---|---|
| September 2, 2022 | 6,045 | $14.44 | $87,290 |
| January 13, 2023 | 1,832 | $10.57 | $19,364 |
| March 20, 2023 | 2,029 | $9.81 | $19,904 |
| April 26, 2023 | 3,550 | $9.42 | $33,441 |
| June 5, 2023 | 3,150 | $7.97 | $25,106 |
| July 13, 2023 | 1,554 | $9.49 | $14,747 |
| July 19, 20923 | 2,019 | $8.29 | $16,738 |
| September 20, 2023 | 2,047 | $4.13 | $8,454 |
| October 26, 2023 | 1,626 | $3.24 | $5,268 |
| December 5, 2023 | 6,299 | $3.62 | $22,802 |
| January 16, 2024 | 1,841 | $2.86 | $5,265 |
| June 5, 2024 | 9,749 | $3.98 | $38,801 |
| July 19, 2024 | 1,011 | $3.65 | $3,690 |
| September 20, 2024 | 2,112 | $4.93 | $10,412 |
| October 10, 2024 | 3,899 | $5.37 | $20,938 |
| October 28, 2024 | 1,678 | $4.46 | $7,484 |
| December 5, 2024 | 12,999 | $5.05 | $65,645 |
| January 21, 2025 | 1,161 | $3.65 | $4,238 |

Thus, before the fraud was exposed, Defendant LaRose sold 69,799 shares of Company stock on inside information, for which he received approximately $502,190 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

32.     The 2024 Proxy Statement stated the following about Defendant LaRose:

**Brian LaRose** has served as our Chief Financial Officer since August 2021, and as our Senior Vice President, Finance from September 2020 to August 2021. Prior to joining us, Mr. LaRose served as Divisional CFO for HP's 3D printing business unit. He previously led the separation management office during the separation of HP into two publicly traded Fortune 50 companies – at the time, the largest such split in U.S. history. During his 17 years with HP, Mr. LaRose also led HP's SEC reporting group and managed investor relationships in over 15 countries. Mr. LaRose began his career with Deloitte's mergers and acquisitions, and audit practices. Mr. LaRose is a member of the board of directors of the National Foundation for Autism Research, where he also serves as Treasurer. Mr. LaRose holds a bachelor's degree from Colby College, and a master's degree in business administration and a master's degree in accounting from Northeastern University.

**Defendant Nuzzo**

33.     Defendant Nuzzo served as the Company's Chief Operating Officer and President from July 2019 until August 2022. Before that, Defendant Nuzzo served as the Company's CFO from May 2015 until August 19, 2021.

34.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Nuzzo made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| January 13, 2022 | 35,252 | $18.99 | $669,435 |
| March, 2022 | 55,090 | $19.30 | $1,063,237 |
| July 13, 2022 | 6,818 | $05.06 | $102,679 |

Thus, in total, before the fraud was exposed, Defendant Nuzzo sold 97,160 shares of Company stock on inside information, for which he received approximately $1,835,352 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

35.     The proxy statement which the Company filed on Form 14A with the SEC on May 5, 2022 (the "2022 Proxy Statement") stated the following about Defendant Nuzzo:

**Michael Nuzzo** has served as our Chief Operating Officer and President of Petco Services since July 2019, and as Chief Financial Officer from May 2015 to August 2021. Prior to joining us, Mr. Nuzzo served from July 2014 to April 2015 as Chief Administrative Officer at 4moms, a technology and robotics startup company. Prior to joining 4moms, Mr. Nuzzo served as the Executive Vice President and Chief Financial Officer for GNC Holdings, Inc., a multinational health and nutrition retailer, from 2008 to 2014, playing a lead role in the company's initial public offering in 2011. From 1999 to September 2008, Mr. Nuzzo served in various senior level finance, retail operations, and strategic planning roles with Abercrombie & Fitch, a specialty retailer of casual clothing for men, women, and children, including Senior Vice President of Corporate Finance from June 2008 to September 2008 and Vice President of Corporate Finance from January 2006 to May 2008. Prior to his work in the retail sector, Mr. Nuzzo was a senior consultant in the healthcare industry with William M. Mercer and Medimetrix Group. Since August 2021, Mr. Nuzzo has served on the board of directors of KinderCare Learning Companies, Inc., an operator of childcare and early childhood education facilities, where he also serves as Chairman of KinderCare's Audit Committee and a member of its Compensation Committee. Mr. Nuzzo holds a bachelor's degree in economics from Kenyon College and a master's degree in finance and accounting from the University of Chicago.

**Defendant Breitner**

36.     Defendant Breitner has served as a Company director since 2016 and additionally serves as the Chairman of the Board's Audit Committee. Defendant Breitner has also served as a Senior Advisor at CVC (defined below) since February 2024, where he was previously a Managing Partner after serving the firm as a senior executive from 2007 until February 2024.

37.     The 2025 Proxy Statement stated the following about Defendant Breitner:

Cameron Breitner has served as a member of our board of directors since 2016. Since February 2024, Mr. Breitner has served as a Senior Advisor at CVC, one of our Sponsors. Previously, he was a Managing Partner at CVC, having served as a senior executive at the firm from 2007 until February 2024, where he served as the head of CVC's San Francisco office and shared

responsibility for overseeing CVC's North and South American Private Equity activities. Prior to joining CVC, Mr. Breitner was a Managing Director at Centre Partners, a private equity firm, where he worked from 1998 to 2007. Prior to Centre Partners, he worked in mergers and acquisitions at Bowles Hollowell Conner & Co., an investment banking firm. Mr. Breitner also serves on the board of directors of Advantage Solutions Inc., a leading business solutions provider to consumer goods manufacturers and retailers, Worldwide Express/GlobalTranz, a third-party logistics provider, and CFGI, a financial and accounting advisory firm. Mr. Breitner has previously served on the board of directors of BJ's Wholesale Club Holdings, Inc., a membership-only warehouse club operator, Asplundh, a vegetation management and infrastructure services company, Teneo, a global advisory firm, and many other public and private companies. Mr. Breitner received a bachelor's degree in psychology from Duke University. His retail industry experience qualifies him to serve on our board of directors.

**Defendant Briggs**

38.    Defendant Briggs has served as a Company director since 2018 and serves as a member of the Audit Committee and as the Chairperson of the Nominating and Corporate Governance Committee.

39.    The 2025 Proxy Statement stated the following about Defendant Briggs:

Gary Briggs has served as a member of our board of directors since 2018 and is currently an independent marketing and strategy consultant. Most recently, Mr. Briggs served as the Senior Advisor, Paid Media, Harris for President from July 2024 to November 2024. He also serves on the board of directors of Etsy, an online marketplace, Combe, Inc., a personal-care company, and Omaze, a private London based company that raises funds for charities. He served on the board of directors of Afterpay, a financial technology company, from January 2020 to January 2022 until it was acquired by Block, Inc., and as Chairman at Hawkfish, a data and technology firm, from September 2019 to May 2021. Between 2013 and 2018, Mr. Briggs served as the Chief Marketing Officer of Meta Platforms, Inc. (formerly Facebook, Inc.). Prior to joining Meta, he served in various leadership roles at Google Inc. Before then, he held a number of marketing and general management leadership roles at eBay Inc., PayPal, Inc., PepsiCo, Inc., and IBM Corp. Earlier in his career, he was a management consultant with McKinsey and Company. He holds a bachelor's degree from Brown University and a master's degree from the Kellogg School of Management at Northwestern University. His extensive

experience in marketing and brand management qualifies him to serve on our board of directors.

**Defendant Chande**

40.    Defendant Chande has served as a Company director since 2016 and serves additionally as a member of the Nominating and Corporate Governance Committee. Defendant Chande is a Partner, U.S. Head of Consumer and Co-Head of Business Services at CVC (defined below) and has been since joining in 2016.

41.    The 2025 Proxy Statement stated the following about Defendant Chande:

Nishad Chande has served as a member of our board of directors since 2016. He is Partner, U.S. Head of Consumer and Co-Head of Business Services at CVC, one of our Sponsors, which he joined in 2016. Prior to joining CVC, he worked at Centre Partners, a private equity firm, from 2005 to 2016, Bain & Company, a global management consulting firm, from 2003 to 2005, Raymond James Capital, an independent investment bank and financial services company, from 1999 to 2001, and Schroders, an asset management company, from 1997 to 1999. Mr. Chande previously served on the board of directors of BJ's Wholesale Club Holdings, Inc., a membership-only warehouse club operator. Mr. Chande holds a bachelor's degree in economics and mathematics from Dartmouth College and a master's in business administration degree from the Wharton School at the University of Pennsylvania. His experience across multiple industries qualifies him to serve on our board of directors.

**Defendant Stadler**

42.    Defendant Stadler has served as a Company director since 2016. Defendant Stadler is also a Managing Partner and board member at CVC (defined below), which he joined in 2007.

43.    The 2025 Proxy Statement stated the following about Defendant Stadler:

Christopher Stadler has served as a member of our board of directors since 2016. He is a Managing Partner at CVC, one of our Sponsors, which he joined in 2007, and is also on the board of CVC. Prior to joining CVC, he worked for Investcorp, a global investment manager, as Head of Private Equity, North America after joining as Managing Director in 1996. Mr. Stadler previously served on the board of directors of BJ's Wholesale Club Holdings, Inc., a

membership-only warehouse club operator. He holds a bachelor's degree in economics from Drew University and a master's degree in business administration from Columbia University. His experience across multiple industries qualifies him to serve on our board of directors.

**Defendant Sullivan**

44.    Defendant Sullivan has served as a Company director since 2021 and additionally serves as a member of the Compensation Committee. Defendant Sullivan is also a Senior Managing Director and Chief Talent Officer at CPP (defined below), which she joined in 2016.

45.    The 2025 Proxy Statement stated the following about Defendant Sullivan:

Mary Sullivan has served as a member of our board of directors since 2021. Ms. Sullivan is Senior Managing Director & Chief Talent Officer at CPP Investments, one of our Sponsors, which she joined in 2015 and where she currently is responsible for talent acquisition, organizational development, international mobility, compensation and benefits, and inclusion and diversity. Prior to joining CPP Investments, Ms. Sullivan was Senior Vice President, People at Holt, Renfrew & Co., a Canadian luxury department store chain, from 2014 to 2015, where she was responsible for the Human Resources function. From 2007 to 2014, she worked at Four Seasons Hotels and Resorts, a luxury hospitality company, ending her tenure at the company in the role of Senior Vice President, Corporate Human Resources. She also spent seven years as a leader of the Human Resources function at IMAX Corporation, an entertainment technology company, ending as Senior Vice President of Human Resources. Ms. Sullivan holds a bachelor's degree in administrative and commercial studies from the University of Western Ontario and a master's degree in business administration from the Rotman School of Management at the University of Toronto. Her experience in leadership roles across the retail and hospitality industries qualifies her to serve on our board of directors.

**Defendant Lake**

46.    Defendant Lake served as a Company director from 2018 until July 24, 2025, and served additionally during her tenure as a member of the Compensation Committee.

47.    The 2024 Proxy Statement stated the following about Defendant Lake:

Christy has served as a member of our board of directors since 2018. Since April 2020, she has served as the Chief People Officer at Twilio, a cloud communications platform. Previously, from 2018 to 2020, Ms. Lake served as Senior Vice President and Chief People Officer at Box, Inc., an internet company. Prior to Box, Ms. Lake worked at Medallia, serving as VP of People and Culture from 2016 to 2018 and VP of HRBP & HR Operations in 2016. Ms. Lake also served as Global Head of HR for HP Inc.'s Personal Systems division from 2015 to 2016 and has held additional HR positions at HP Inc. and The Home Depot, among other companies. Ms. Lake holds a bachelor's degree in political science from the University of Connecticut. Her experience in leadership across various industries qualifies her to serve on our board of directors.

### Relevant Non-Parties

### *CVC Capital Partners*

48.    CVC Capital Partners ("CVC") is a private equity company responsible for managing "certain funds" which the 2025 Proxy Statement terms the "CVC Funds." The CVC Funds indirectly control Petco.

### *Canada Pension Plan Investment Board*

49.    Along with the CVC Funds, the Canada Pension Plan Investments Board (with its affiliates, "CPP") controls several funds ("CPP Investments") that, along with the CVC Funds, exercise indirect control over Petco.

### *Scooby Aggregator, LP*

50.    The CVC Funds and CPP Investments primarily exercise their control over Petco via Scooby Aggregator, LP ("Scooby"). The 2025 Proxy Statement lists Scooby as the Company's "Principal Stockholder." As the Principal Stockholder, Scooby controls, as of May 30, 2025, "approximately 66% of the outstanding voting power of the Company with respect to director elections," rendering Petco a controlled company under NASDAQ rules.

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

51.    By reason of their positions as officers and directors, and/or fiduciaries of Petco and because of their ability to control the business and corporate affairs of Petco, the

Individual Defendants owed Petco and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Petco in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Petco and its shareholders so as to benefit all shareholders equally.

52.    Each director and officer of the Company owes to Petco and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

53.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Petco, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

54.    To discharge their duties, the controlling shareholder, officers, and directors of Petco were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

55.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Petco, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

56.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

57.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Petco were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of California, Delaware, and the United States, and pursuant to Petco's corporate governance and applicable codes of conduct and/or ethics;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Petco conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Petco and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Petco's operations would comply with all applicable laws and Petco's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

58.    Each of the Individual Defendants further owed to Petco and the shareholders the duty of loyalty requiring that each favor Petco's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

59.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Petco and were at all times acting within the course and scope of such agency.

60.    Because of their advisory, executive, managerial, directorial, and controlling shareholder positions with Petco, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

61.    The Individual Defendants, because of their positions of control and authority,

were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Petco.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

62.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

63.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets.

64.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is or was a director of Petco was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

65.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct

part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

66.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Petco and was at all times acting within the course and scope of such agency.

## PETCO'S CODE OF BUSINESS CONDUCT AND ETHICS

67.    Petco's Code of Business Conduct and Ethics ("Code of Conduct") applies to "directors, officers and employees of the company," and even "vendors and suppliers doing business with the Company are expected to adhere to the principles in this code."

68.    In the section "Ethics," the Code of Conduct states, in relevant part:

The Company and each of its directors, officers, and employees, wherever they may be located, must conduct their affairs with uncompromising honesty and integrity. Business ethics are no different than personal ethics; the same high standard applies to both. As a Petco director, officer, or employee, you are required to adhere to the highest ethical standards.

You are expected to be honest, ethical, and fair and should endeavor to deal fairly with Petco's stakeholders (such as customers, vendors, suppliers, business partners, service providers, competitors and employees). You should not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair-dealing practice. Doing the right thing means doing it right every time.

69.    In the section entitled "Corporate Opportunities," the Code of Conduct states:

You owe a duty to the Company to advance its interests when the opportunity to do so arises and are prohibited from taking for yourself opportunities that are discovered through the use of Company property, information or position. You may not use Company property, information, or position for personal gain. In addition, you may not compete with the Company. If you become aware of any actual or potential business opportunity that relates to Petco, you may not take advantage of the opportunity or share the opportunity with anyone outside Petco without first receiving the approval of the Legal Department or the Board of Directors, as applicable. Notwithstanding the

foregoing, the duties of directors and officers with respect to corporate opportunities are subject to the terms of the Company's certificate of incorporation, as it may be amended and/or restated from time to time.

70.    In the section entitled "Insider Trading," the Code of Conduct states:

It is illegal to buy or sell securities using "material non-public information." "Material information" generally means information where there is a likelihood a reasonable investor would consider it important in deciding whether to buy, hold or sell securities. "Non-public information" is information that is not generally known or available to the public. Insider trading is a crime punishable by civil penalties, criminal fines and prison. Companies may also face civil penalties for insider trading violations by their employees and other agents. In addition to being against the law, insider trading or allegations of improper trading of securities by our employees or directors can cause negative publicity for Petco and significant damage to our reputation and business.

While working for Petco, you may learn material non-public information about our Company or one of our business partners or other third parties. Employees and directors (as well as their family members and controlled entities) may not trade in the securities of any company when they are aware of material non-public information about that company. This policy against "insider trading" applies to trading in Company securities, as well as to trading in the securities of other companies, such as the Company's customers, vendors, business partners, distributors, suppliers and companies with which the Company may be negotiating a major transaction. In addition, employees and directors (as well as their family members and controlled entities) may not convey material non-public information about the Company or another company to others, or suggest that anyone purchase or sell any company's securities while they are aware of material non-public information about that company. This practice, known as "tipping," also violates the securities laws and can result in the same civil and criminal penalties that apply to engaging in insider trading directly, even if the employee does not receive any money or derive any benefit from trades made by persons to whom the employee passed material non-public information.

71.    In the section entitled "Maintaining Books and Records and Public Reporting," the Code of Conduct states, in relevant part:

In order to provide an adequate system of internal accounting and controls, the Company is required under U.S. federal securities laws and generally accepted accounting principles to keep books, records and accounts that accurately reflect all transactions. Also, the Company is required to provide full, fair, accurate, timely, and understandable disclosure in reports and documents that it files with or furnishes to the Securities and Exchange Commission ("SEC") and in all of its other public communications. The Company expects all personnel to ensure that those portions of its books, records, and accounts for which they have responsibility are valid, complete, accurate, and supported by appropriate documentation in verifiable form. Similarly, the Company expects all personnel to ensure that all reports and documents filed with the SEC and all other public communications for which they are responsible provide full, fair, accurate, timely, and understandable disclosure and that the same are filed on a timely basis.

72.    In the section entitled "Procedures for Reporting Possible Violations," the Code of Conduct states, in relevant part:

You are responsible for adhering to the standards in this Code, for raising questions if you are in doubt about the best course of action, and for reporting possible misconduct promptly after it comes to your attention. Choosing to speak up about workplace concerns helps builds a healthy, ethical, and compliant company and is part of our culture. To promote that culture, the Company encourages employees to speak up and raise questions and concerns promptly about any situation that may violate the law, this Code, our core values, or our policies.

* * *

Concerns regarding past, ongoing, or potential improper, illegal, fraudulent, unethical, or retaliatory conduct or activities (including questionable accounting, internal controls and auditing matters) should be promptly reported to your manager, if applicable, or, if you feel uncomfortable speaking with your manager (for whatever reason), to any Company leader, Human Resources, the Legal Department or, in the case of directors, to the Chairman of the Audit Committee so that, as appropriate, the report can be investigated and follow-up action taken. You may also report anonymously to our whistleblower       hotline       at       1.888.736.9834       or       by       visiting www.PetcoHotline.com or via email at ethics@petco.com. The hotline is answered by a third party and is confidential and available 24 hours a day,

seven days a week. Complaints regarding violations in relation to accounting or auditing matters or securities laws matters will be investigated in accordance with the Audit Committee Procedures for Handling Reports of Potential Misconduct.

73.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the scheme to issue materially false and/or misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and the aiding and abetting thereof. Additionally, four of the Individual Defendants violated the Code of Conduct by engaging in lucrative insider trading while the Company's stock price was artificially inflated as a result of the Individual Defendants breaching their fiduciary duties to the Company by causing the Company to issue false and misleading statements. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct.

## PETCO'S AUDIT COMMITTEE CHARTER

74.    Petco also maintains an Audit Committee Charter (the "Audit Committee Charter"). The Audit Committee charter states that the Audit Committee's purpose is to, "at a minimum," *inter alia*:

- represent and assist the Board in discharging its oversight responsibility relating to: (a) the accounting and financial reporting processes of the Company and its subsidiaries, including the audits of the Company's financial statements and the integrity of the financial statements; (b) the Company's compliance with legal and regulatory requirements; (c) the outside auditor's qualifications and independence; and (d) the performance of the Company's internal audit function and the Company's outside auditor; and

- oversee preparation of the report required by the rules of the SEC to be included in the Company's annual proxy statement.

75. In enumerating the specific responsibilities of the Audit Committee, the Audit Committee Charter, under the heading "Purpose, Duties, and Responsibilities," lists:

(a) Be directly responsible, in its capacity as a committee of the Board, for the appointment, compensation, retention and oversight of the work of the outside auditor. In this regard, the Audit Committee will appoint and retain, subject to ratification by the Company's stockholders, compensate, evaluate, and terminate when appropriate, the outside auditor, which will report directly to the Audit Committee.

(b) Obtain and review, at least annually, a report by the outside auditor describing: (1) the outside auditor's internal quality-control procedures; and (2) any material issues raised by the most recent internal quality-control review, or peer review, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the outside auditor, and any steps taken to deal with any such issues.

(c) Approve in advance all audit and permissible non-audit services to be provided by the outside auditor, and establish policies and procedures for the pre-approval of audit and permissible non-audit services to be provided by the outside auditor.

(d) At least annually, consider the independence of the outside auditor, and, consistent with rules of the Public Company Accounting Oversight Board ("PCAOB"), obtain and review a report by the outside auditor describing any relationships between the outside auditor, and the Company or individuals in financial reporting oversight roles at the Company, that may reasonably be thought to bear on the outside auditor's independence and discuss with the outside auditor the potential effects of any such relationships on independence.

(e) Review and discuss with the outside auditor the matters required to be discussed by the outside auditor under Auditing Standard No. 1301, as adopted by the PCAOB and amended from time to time, including any

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

problems or difficulties the outside auditor encountered in the course of its audit work and management's response.

(f) Meet to review and discuss with management and the outside auditor the annual audited and quarterly financial statements of the Company (including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations") and the independent auditor's reports related to the financial statements.

(g) Recommend to the Board, based on the review and discussion described in paragraphs (d) - (f) above, whether the financial statements should be included in the Annual Report on Form 10-K.

(h) Receive reports from the outside auditor and management regarding, and review and discuss the adequacy and effectiveness of, the Company's internal controls, including any significant deficiencies in internal controls and significant changes in internal controls reported to the Audit Committee by the outside auditor or management.

(i) Receive reports from management regarding, and review and discuss the adequacy and effectiveness of, the Company's disclosure controls and procedures.

(j) Review and discuss with the principal internal auditor of the Company: (1) the annual audit plan and the adequacy of internal audit resources; and (2) the results of the internal audit program.

(k) Annually review and discuss the performance and effectiveness of the internal audit function.

(l) Approve the appointment, and dismissal when appropriate, of the principal internal auditor.

(m) Review and discuss earnings press releases, and corporate practices with respect to earnings press releases and financial information and earnings guidance provided to analysts, and ratings agencies (when requested).

(n) Review and discuss the Company's practices with respect to risk assessment and risk management, and risks related to matters including the Company's financial statements and financial reporting processes, compliance, information technology and cybersecurity.

(o) Oversee the Company's compliance program with respect to legal and regulatory requirements, including the Company's code of business conduct and ethics and the Company's policies and procedures for monitoring compliance; and at least annually, meet to review the implementation and effectiveness of the Company's compliance program with the compliance officer, who shall have the authority to communicate directly to the Audit Committee, promptly, about actual and alleged violations of law or the Company's code of business conduct and ethics, including any matters involving criminal or potential criminal conduct.

(p) Oversee procedures for handling reports of potential misconduct, including: (1) violations of law or the Company's code of business conduct and ethics; (2) complaints regarding accounting, internal accounting controls, auditing and federal securities law matters; and (3) the confidential, anonymous submission of concerns by employees regarding accounting, internal accounting controls, auditing and federal securities law matters.

(q) Oversee policies and procedures for the review, approval and ratification of related person transactions, as defined in applicable SEC rules, review related person transactions, and oversee other related party transactions governed by applicable accounting standards.

(r) Oversee policies for the hiring of employees and former employees of the outside auditor.

(s) Annually evaluate the performance of the Audit Committee and the adequacy of the Audit Committee's charter and recommend changes to the Audit Committee's charter to the Board as appropriate.

76.    In violation of the Audit Committee Charter, Defendants Breitner and Briggs conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and

diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

77.    Headquartered in San Diego, California, Petco is a specialty retailer focused on pet goods and services, including a variety of pet products which the Company sells both in brick and mortar ("B&M") and online stores, and a range of services including veterinary and grooming services.

78.    In tracking its financial and economic performance, Petco uses a key metric called comparable sales (also referred to as same-store sales or "comp"). Comparable sales measures the change in period-over-period net sales from B&M and digital stores that have been open for the period under evaluation. Petco uses the comparable sales metric to evaluate its overall business performance, including factors such as customer retention, the frequency of store visits, and the number of items customers purchase on each visit to a B&M or digital store.

### *Petco's Initial Public Offering*

79.    Petco filed a registration statement on Form S-1 with the SEC on December 3, 2020 (the "Registration Statement") in connection with its initial public offering ("IPO"), which was ultimately declared effective by the SEC (after several amendments) on January 13, 2021. On January 15, 2021, Petco subsequently filed on Form 424B4 with the SEC a prospectus (the "Prospectus") in connection with its IPO. The Prospectus incorporated and formed part of the Registration Statement.

80.    Both prior to and following the IPO, the Company boasted to investors of its rapid growth and remarkable profitability coming out of the Pandemic. Indeed, the Individual Defendants claimed that, during the Pandemic, the general population, increasingly stuck at home, became more interested in pet ownership. Consequently, a larger number of consumers began to adopt and/or buy pets. This in turn led to more

consumers making long-term investments in various pet-related goods and services. The Company, arguing that it was well positioned to capitalize on this trend, as evidenced by the Pandemic tailwinds it had experienced, repeatedly bragged that such tailwinds were not fleeting trends, but instead represented a sustainable source of growth, *including with respect to Petco's comparable sales*.

81.    The Individual Defendants' claims were tied in part to their attempt to transform Petco from a "standard" pet retailer to a health-focused pet goods and services model. Indeed, according to the Individual Defendants, as younger demographics became pet owners, their increased health consciousness (relative to older age cohorts) would impact their purchasing habits with respect to their pets. Defendants argued that this was part of a trend they referred to as "pet humanization" and the related demand for the "premiumization" of pet goods. The Individual Defendants' claim, in short, was that younger consumers were more likely to treat pets more similarly to humans than chattel, and were thus more likely  to make health-conscious decisions for their pets, thereby purportedly driving and sustaining a demand for more expensive, higher-end pet goods.

82.    The Individual Defendants thus represented that pivoting Petco's focus to a purportedly differentiated business strategy focused on healthy, premium pet food was a sustainable, profitable approach that would drive long-term growth. The Individual Defendants presented the change as part of a gradual shift in Petco's business model, citing the Company's 2018 announcement that it was no longer going to sell dog or cat foods containing artificial ingredients. The Individual Defendants also claimed this move would drive partnerships with premium and exclusive brands generally cordoned-off in specialty retailers.

83.    On January 14, 2021, the first day of the Relevant Period, Petco's Class A common stock began public trading on the NASDAQ pursuant to the materially false and/or misleading information contained in its Registration Statement and Prospectus.

These documents contained a letter from Defendant Coughlin, which stated the following, in relevant part:

> [O]ur business transformation has focused on driving a differentiated merchandise strategy, building sticky services, and completely revamping our digital offerings . . . . [O]ur current focus areas have generated attractive top- and bottom-line growth and position us for compelling long-term growth and profitability.
>
> * * *
>
> Suffice it to say, our business was strong before the pandemic, accelerated during the pandemic, and we expect it to continue to grow at an accelerated rate long after the pandemic passes.

84.     The Prospectus and Registration Statement also discussed Petco's competitive strengths, including, *inter alia*, stating the following:

> Our product strategy is built around an extensive offering that features premium owned and partner brands known for quality and innovation.
>
> * * *
>
> Over the last three years, we have demonstrated the speed and depth of our innovation platform through the launch of 89 new brands and 5,000 new products. In 2016, we launched our first major proprietary pet food brand, WholeHearted, which features a premium ingredient panel, an attractive price point, quality packaging, and authentic branding that effectively targets millennial pet parents . . . . We also believe our Well & Good brand has similar potential to tap into customer demand for premium wellness products. Sales of our owned brand portfolio have grown at a 14% CAGR [compound annual growth rate] between Fiscal 2017 and Fiscal 2019, and for Fiscal 2019, our owned brands generated sales of $1.1 billion, or approximately 27% of total product sales, up from 17% of product sales in Fiscal 2015.

85.     Despite these optimistic predictions, the Pandemic tailwinds *did* abate, at which point Petco's sales and profitability began to freefall. Despite this, however, the

Individual Defendants continued to represent that the premium, healthy pet food-focused business model remained viable.

### False and Misleading Statements

*March 18, 2021 Fourth Quarter 2020 Press Release*

86.    On March 18, 2021, Petco issued a press release in which it announced its financial results for the fourth quarter of 2020 (the "Q4 2020 Press Release"). The press release quoted Defendant Coughlin, who stated the following, in relevant part:

> On the heels of a successful IPO in January, we closed the year with a strong fourth quarter, and that momentum has carried into 2021 . . . . Our comprehensive petcare ecosystem focused on health and wellness, coupled with our digitally-led, multichannel experience is resonating with pet parents and generating significant competitive advantages that are evident in our performance. Our category continues to grow powered by the millions of incremental new pets in households, ***which is creating an annuity for years to come . . . . Petco [is] well positioned for long-term growth.***[2]

87.    The Q4 2020 Press Release also represented that "[f]iscal 2020 revenue and comp[arable] sales both grew 11%, reflecting [the] continued success of Petco's transformation into an omnichannel Health and Wellness provider[.]"

*March 18, 2021 Earnings Call*

88.    On March 18, 2021, the same day the Company released the Q4 2020 Press Release, Petco also held an earnings call to discuss its financial results for the fourth quarter of 2020 with investors and analysts. On the call, Defendant Coughlin represented that Petco's healthy, premium pet food strategy would drive years of sustainable growth, even after the Pandemic tailwinds abated. In so doing, Defendant Coughlin stated, among other things, that:

> [W]hile the COVID environment has definitely provided a strong industry tailwind, looking forward, the millions of incremental new pets-oriented

---

[2] All is emphasis added unless otherwise specified.

homes in the past 12 months, generated a predictable head spend annuity for years to come.

And coupled with premiumization and humanization trends, the stickiness of a multi-channel customer relationships, we see strong growth long into the future.

* * *

Our transformation has delivered nine consecutive quarters of growth. In particular, we had momentum going into 2020 with strong top line performance. ***That performance accelerated through the pandemic and we're on an exciting growth trajectory even as COVID restrictions relax.***

89.    Defendant Coughlin continued on to address the purported strengths vis-à-vis competitors which Petco was to derive from its ostensibly differentiated healthy and premium pet products strategy. In so doing, Defendant Coughlin stated, in relevant part:

Our own brands and exclusive merchandise deepen our competitive moats and power our growth. Our team has demonstrated the ability to build brands and products that resonate with customers. In both Q4 and full year 2020, our own brands drove double digit growth and are rapidly approaching 30% penetration, further fortifying our differentiation from our competitors.

Our food brand WholeHearted, which we launched in 2016 is now a top three offering while our premium supplies brand Ready, grew almost 90% with aggressive expansion plans ahead. Complementing our own brand offering we also have exclusive partnerships for unique products. ***We're particularly excited about fresh foods projected to more than quadruple into a multi-billion-dollar category over the next several years according to industry forecasts.***

We're focused on becoming a market maker in Fresh in 2021 are said to more than double are just food for dogs distribution, while our recent launch of premium price human grade on its kitchen has broken all our previous initial sales records. Overall, our own brands and brands exist to Petco in specific markets represent over half our portfolio not only enhancing our gross margin, but also creating competitive insulation.

***April 5, 2021, Form 10-K***

90.    On April 5, 2021, the Company filed its annual report on Form 10-K with the SEC (the "2020 10-K"), which was signed by Defendants Coughlin, Nuzzo, Breitner, Briggs, Chande, Lake, Mohan, Simmons, Stadler, and Sullivan. The 2020 10-K stated, in relevant part:

> We offer a highly differentiated owned and exclusive product assortment that engenders strong customer loyalty. We focused on three core product differentiating capabilities: nutritional expertise, exclusive partnerships, and a leading owned brand platform. As a testament to our commitment to pet health and wellness, in May 2019 we made the decision to pivot away from dog and cat food and treats that contain artificial ingredients making us the only major national retailer in the industry to take a stand against artificial ingredients in dog and cat food. We utilized a best brands strategy to form new partnerships with some of the most highly regarded premium food brands in the industry, such as Just Food For Dogs.

91.    The 2020 10-K included as exhibits signed certifications made pursuant to the dictates of the Sarbanes-Oxley Act of 2002 ("SOX" and "SOX certifications"). In these appended SOX certifications, Defendants Coughlin and Nuzzo certified that the 2020 10-K did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

***March 8, 2022 Press Release***

92.    On March 8, 2022, the Company issued a press release announcing its financial results for the fourth quarter of 2021, as well as the full year of 2021 (the "Fiscal Year 2021 Press Release"). The Fiscal Year 2021 Press Release quoted Defendant Coughlin's statements, in relevant part, that:

> Our results for the quarter and full year demonstrate that our focus on long-term, sustainable growth, powered by continued delivery against our strategic growth opportunities, is working . . . . We enter this fiscal year as a stronger company than ever. ***Our category remains strong and resilient; our***

*competitive moats are deepening, and our world-class team is executing to deliver purpose driven performance . . . . [W]e're well positioned to drive enhanced long-term shareholder value.*

**March 8, 2022 Earnings Call**

93.    On March 8, 2022, the same day on which the Company issued the Fiscal Year 2021 Press Release, it also hosted an earnings call with analysts and investors to discuss its financial results for the fourth quarter of 2021, as well as for Fiscal Year 2021. During this call, Defendant Coughlin represented to investors and analysts, in relevant part, that:

> *One of the great things about pet is it's relatively immune to macroeconomic trends. Premiumization has been a multiyear trend. And even today, we're seeing its continuation in this environment.* The best example of that is fresh frozen, where we have a higher ring, higher frequency and where we see outsized growth and by the way, better trip frequency.
>
> In the higher end customer where we sit, we see pricing is relatively inelastic. And the other thing we've talked about before is 70% of our product is either owned, exclusive or covered by that. So our exposure to pricing is less than most.

**March 24, 2022 Form 10-K**

94.    On March 24, 2022, the Company filed its annual report on Form 10-K with the SEC (the "2021 10-K"), which was signed by Defendants Coughlin, LaRose, Breitner, Briggs, Chande, Lake, Mohan, Simmons, Stadler, and Sullivan. The 2021 10-K stated, in relevant part:

> Our product offering leverages a broad, carefully curated assortment of owned and exclusive merchandise and partnerships with premium third-party brands to provide customers with high quality nutrition without artificial ingredients, complemented by a wide variety of premium pet care supplies and companion animals. While we offer pet parents a full spectrum of product choices within our high standards of nutrition and quality, *our assortment is weighted towards premium products to address the needs of the growing number of health-conscious pet parents.*

* * *

As pet care demand continues to grow, *we believe we are well-positioned to expand our total addressable market through new offerings, and to capture an outsized portion of the growing market as a fully-integrated, comprehensive pet care provider.* Our owned and exclusive merchandise is unique relative to other large players in the category, driving competitive insulation and focusing on the highest growth categories within the pet industry, like fresh and frozen, as well as premium nutrition and supplies more broadly.

* * *

*We believe that we have built deep competitive "moats" through the breadth and depth of assortment of premium health and wellness products[.]*

95.    The 2021 10-K contained SOX certifications that were substantively the same as those appended to the 2020 10-K, as discussed in ¶ 91, *supra*. These SOX certifications were signed by Defendants Coughlin and LaRose.

### March 22, 2023 Press Release

96.    On March 22, 2023, the Company issued a press release announcing its financial results for the fourth quarter and full Fiscal Year 2022 (the "Fiscal Year 2022 Press Release"). The Fiscal Year 2022 Press Release contained statements by Defendant Coughlin, including, in relevant part:

Record fourth quarter sales, with cash flow exceeding expectations, rounded out a solid fiscal year, once again demonstrating the enduring strength of the pet category and Petco's ability to grow through economic cycles . . . . *As we look ahead, the pet category remains resilient and growing, and we'll continue to execute day-in and day-out while we progress our differentiated long-term growth strategy.*

### March 22, 2023 Earnings Call

97.    Also on March 22, 2023, the Company hosted an earnings call with analysts and investors to discuss its financial results (the "Fiscal Year 2022 Earnings Call"). During the Fiscal Year 2022 Earnings Call, Defendant Coughlin maintained his prior representations that Petco's strategic focus on premium, healthy pet food products was continuing to provide for the Company's competitive position and drive its sustainable

growth, stating, in relevant part, that:

> Turning to our differentiated merchandise, 2022 was another strong year. The addition of exclusive and formally independent only store brands such as Backcountry and Stella & Chewy's, have been powerful in driving our premium mix and accessing new customers. Meanwhile, our mix of popular own brand supplies and consumables including Reddy and WholeHearted, which both grew in revenue and penetration over the year, continue to meet the core humanization trend, while also catering to a variety of wallet sizes. ***Taken as a whole, our differentiated assortment is driving retention with our health-focused customers*** offering products unavailable in mass or many online channels and reducing our competitive promotional exposure.
>
> * * *
>
> With the Fresh Frozen pet category expected to reach $6 billion within the next four years, and the direct-to-consumer pet segment growing faster than traditional pet e-commerce. ***These custom meals further enhance Petco's ability to lead the way in the megatrends of personalization and humanization.***

98.    Also during the Fiscal Year 2022 Earnings Call, Defendant LaRose provided financial guidance for Petco for Fiscal Year 2023, including, *inter alia*, adjusted EBITDA of $520 million to $540 million and adjusted earnings per share of $0.40 to $0.48.

### March 28, 2023 Form 10-K

99.    On March 28, 2023, the Company filed its annual report on Form 10-K with the SEC (the "2022 10-K"), which was signed by Defendants Coughlin, LaRose, Breitner, Briggs, Chande, Lake, Mohan, Simmons, Stadler, and Sullivan. The 2022 10-K contained substantively the same statements referenced in the 2021 10-K with respect to Petco's ostensible ability to capture market share and strengthen its position by strategically focusing on premium, healthy pet food products.

100.    Furthermore, appended to the 2022 10-K were SOX certifications signed by Defendants Coughlin and LaRose

101.    The statements referenced in ¶¶ 86-100 herein were materially false and

misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) Petco's Pandemic-related tailwinds were unsustainable; (2) Petco's premium/high-grade pet food business model was unsustainable; (3) the scope and severity of the foregoing was such that mitigation and correction would be very expensive and negatively impact Petco's sale metrics; (4) Petco's ability to deliver sustainable and profitable growth was overstated; and (5) as a result of the foregoing, the Individual Defendants' public statements were materially false and/or misleading at all relevant times.

### *May 12, 2023 Proxy Statement*

102.    On May 12, 2023, the Company filed the 2023 Proxy Statement. Defendants Briggs, Chande, Sullivan, Coughlin, Breitner, Simmons, Lake, Mohan, and Stadler solicited the 2023 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

103.    The 2023 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) elect three director nominees as Class III directors to serve for a three year term; (2) approve on a non-binding, advisory basis, proposed executive compensation; (3) issue the First Amendment to Company's 2021 Equity Incentive Plan (the "2021 Equity Incentive Plan," and subsequently, the "Amended Incentive Plan") to increase the number of shares of Class A Common Stock authorized for issuance; (4) approve an Amendment to the Company's Second Amended and Restated Certificate of Incorporation to limit the liability of certain officers as permitted by Delaware law; and (5) ratify appointment of EY as the Company's independent registered public accounting firm for Fiscal Year 2023.

104.    Regarding the Board's oversight functions, the 2023 Proxy Statement stated the following, in relevant part:

> Our well-balanced board of directors is uniquely positioned to effectively guide our strategy and oversee our operations in the rapidly-changing retail industry and macroeconomic environment. We believe that an effective board should be made up of individuals who collectively provide an appropriate

balance of diverse occupational and personal backgrounds and perspectives, and who have a range of skills and expertise sufficient to provide guidance and oversight with respect to the Company's strategy and operations. As such, our board expects directors to be open and forthright, to develop a deep understanding of the Company's business, to exercise sound judgment in fulfilling their oversight responsibilities, to embrace Petco's values and culture, and to possess the highest levels of integrity.

105.    Regarding the Company's Code of Conduct, the 2023 Proxy Statement stated the following:

Our board adopted a Code of Business Conduct and Ethics relating to the conduct of our business by all of our employees, executive officers (including our principal executive officer and principal financial officer/principal accounting officer (or persons performing similar functions)) and directors. This code satisfies the requirement that we have a "code of conduct" under the Nasdaq and SEC rules and is available on our website at **ir.petco.com/corporate-governance/documents-and-charters.** To    the extent required under the Nasdaq and SEC rules, we intend to disclose future amendments to certain provisions of this code, or waivers of such provisions, applicable to any of our executive officers or directors, on our website identified above.

106.    Defendants Briggs, Chande, Sullivan, Coughlin, Breitner, Simmons, Lake, Mohan, and Stadler caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) Petco's Pandemic-related tailwinds were unsustainable; (2) Petco's premium/high-grade pet food business model was unsustainable; (3) the scope and severity of the foregoing was such that mitigation and correction would be very expensive and negatively impact Petco's sale metrics; (4) Petco's ability to deliver sustainable and profitable growth was overstated; and (5) as a result of the foregoing, the Individual Defendants' public statements were materially false and/or misleading at all relevant times.

107.    The 2023 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make

the numerous false and/or misleading statements and omission alleged herein; and (2) failing to report violations of the Code of Conduct. Furthermore, the 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

108.    As a result of Defendants Briggs, Chande, Sullivan, Coughlin,    Breitner, Simmons, Lake, Mohan, and Stadler causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Briggs, Chande, and Sullivan as Class III directors, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve on a non-binding, advisory basis, the proposed executive compensation; (3) issue the First Amendment to Company's 2021 Equity Incentive Plan to increase the number of shares of Class A Common Stock authorized for issuance; (4) approve an Amendment to Company's Second Amended and Restated Certificate of Incorporation to limit liability of certain officers as permitted by Delaware law; and (5) ratify appointment of EY as the Company's independent registered public accounting firm for Fiscal Year 2023.

**The Truth Begins to Emerge as the False and Misleading Statements Continue**

### *May 24, 2023 Earnings Call*

109.    The truth first began to emerge on May 24, 2023 when the Company held an earnings call with analysts and investors to discuss its financial results for the first quarter of Fiscal Year 2023 (the "Q1 2023 Earnings Call"). During the Q1 2023 Earnings Call, the Company reaffirmed its financial guidance for Fiscal Year 2023. However, Defendant Coughlin cautioned attendees that the Company was "seeing some value-seeking behaviors in [Petco's] customer base." Defendant Coughlin sought to reassure attendees that this shift to cheaper products did not constitute a repudiation of the Company's premium, healthy pet food business model, stating that for those customers rejecting the more expensive options, "[Petco] saw a demand shift into [Petco's] own brand offerings such as WholeHearted, providing pet parents with a value-oriented yet health-focused alternative

that positions [the Company] well competitively."

110.   On this news, the price per share of the Company's common stock fell $1.85 per share, or approximately 18%, from a closing price of $10.18 per share on May 23, 2023 to close at $8.33 per share on May 24, 2023. Because Defendants continued to conceal the full truth regarding the material representations alleged herein, the price per share of the Company's common stock remained artificially inflated. Specifically, Defendants continued to make false and/or misleading statements and/or failed to disclose that, *inter alia* (1) Petco's Pandemic-related tailwinds were unsustainable; (2) Petco's premium/high-grade pet food business model was likewise unsustainable; (3) the scope and severity of the foregoing was such that mitigation and correction would be very expensive and thus negatively impact Petco's sale metrics; (4) Petco's ability to deliver sustainable and profitable growth was overstated; and (5) as a result of the foregoing, the Individual Defendants' public statements were materially false and/or misleading at all relevant times.

### August 24, 2023 Press Release

111.   On August 24, 2023, the Company issued the Q2 2023 Press Release before the markets opened. The Q2 2023 Press Release contained a negative revision to the Company's 2023 adjusted EBITA guidance all the way down to a range of $460 million to $480 million—a significant decrease from a range $520 to $540 million. The Q2 2023 Press Release also negatively revised the Company's guidance for its earnings per share range: the new range nearly halved the original predictions, dropping from a range of $0.40 to $0.48 to $0.24 to $0.30. Defendant LaRose, attempting to explain the negative revisions, was quoted in the press release as saying, *inter alia*, that the cause was a "shift in consumer spending and pressures on [the Company's] discretionary business."

### August 24, 2023 Earnings Call

112.   On August 24, 2023, the same day it issued the Q2 2023 Press Release, the Company hosted an earnings call with analysts and investors to discuss its financial results for the second quarter of Fiscal Year 2023 (the "Q2 2023 Earnings Call"). During the Q3

2023 Earnings Call, Defendant Coughlin disclosed that the Company "continue[d] to see a bifurcation among pet parents, with ongoing migration to more premium foods on the one hand and an uptick in value seeking behaviors amongst the second cohort."

113.   On this news, the price per share of the Company's common stock fell $1.35 per share, or approximately 21%, from $6.54 on August 23, 2023 to close at $5.19 on August 24, 2023. Because Defendants continued to conceal the full truth regarding the material representations alleged herein, the price per share of the Company's common stock remained artificially inflated. Specifically, Defendants continued to make false and/or misleading statements and/or failed to disclose that, *inter alia* (1) Petco's Pandemic-related tailwinds were unsustainable; (2) Petco's premium/high-grade pet food business model was likewise unsustainable; (3) the scope and severity of the foregoing was such that mitigation and correction would be very expensive and thus negatively impact Petco's sale metrics; (4) Petco's ability to deliver sustainable and profitable growth was overstated; and (5) as a result of the foregoing, the Individual Defendants' public statements were materially false and/or misleading at all relevant times.

### *November 29, 2023 Press Release*

114.   On November 29, 2023, the Company issued a press release announcing its financial results for the third quarter of Fiscal Year 2023 (the "Q3 2023 Press Release"). The Q3 2023 Press Release contained further negative revisions to its prior financial guidance. The Company's EBITDA guidance was again negatively adjusted, this time to a still lower range of $400 million. Similarly, the Company's earnings per share guidance was adjusted all the way down to a mere $0.08—a significant drop from its previously lowered range of $0.24 to $0.30.

115.   The Q3 2023 Press Release further revealed that Petco was broadening its product offerings to include "value" (read, "cheaper") pet food brands in an effort to enhance its sales. To this end, the Q3 2023 Press Release quoted Defendant Coughlin addressing the matter, in relevant part:

Our [Q3] results were below our expectations as we continue to navigate a challenging consumer environment and we are taking swift and decisive action to improve the performance of our business by broadening our appeal with customers and tightly managing costs and capital. This includes the introduction of the category's largest national cat and dog food value brands to meet the needs of all pet parents and deliver incremental profits over time[.]

### November 29, 2023 Earnings Call

116.    On the same day, November 29, 2023, the Company hosted an earnings call with analysts and investors to discuss its financial results for the third quarter of Fiscal Year 2023. During opening remarks, Defendant Coughlin provided additional detail with respect to the Company's sudden introduction of cheaper, lower-quality pet food brands amongst its long-touted healthy, premium pet food product selection. In so doing, Defendant Coughlin stated, in relevant part, that:

Over the past years, we've seen significant changes that have impacted consumer spending. While we saw a surge in pet adoption during the pandemic period, coupled with stimulus that facilitated discretionary spending, the current economic environment means many consumers are increasingly discerning in their spending and actively seeking out more value. As a result, it's clear we must adapt our business to meet the needs of consumers in this environment. Consequently, we've launched an operational reset to improve the performance of our business, which is well underway and consists of four key pillars.

The first and most significant is our focus on delivering value. We brought in the category's largest nationally available value brands in food and treats for both dog and cat. These brands include Friskies, Pedigree, Purina 1, Beneful, Temptations, and Milkbone among others. These will complement our best-in-class premium in fresh frozen food, treats, and toppers, allowing us to cycle out slower-moving brands and skews and focus on the highest-velocity skews.

* * *

While we remain committed to being a leader in the still rapidly growing premium, super premium, and fresh frozen categories, this is about choice. Bringing as many pets as possible into our health and wellness ecosystem. Whether chosen because of price sensitivity, brand preference, a picky eater,

or a combination of these, we believe in the current environment it's important that no pet is excluded.

* * *

Our team has acted fast. These brands are already on shelves, having been set in the first few weeks of November. This is in addition to Fancy Feast, where we began expanding our assortment in Q2.

117.   During this same call, Defendant Coughlin confessed to analysts and investors that "the upfront costs and investment in labor and logistics to get these products on shelves has impacted near-term profitability."

118.   During the question-and-answer ("Q&A") portion of the call, analysts were quick to express concern regarding the sudden shift in Petco's strategy. An Evercore ISI analyst noted that this change constituted a "big shift in focus" compared to the Company's representations "[d]uring the IPO [when] [it] always mentioned . . . premiumization and premium food," and continued on to question the attendant "margin impact" of the decision. In response, Defendant LaRose stated that the "margin rates on these products are lower than the average food margin of the rest of our chain," but that Petco was making these changes in large part to "get[] more customers."

119.   In response to a Morgan Stanley analyst's inquiry into the "percentage of either the consumables business or the overall business" value brands represented previously "before [Petco] moved upstream with product," Defendant Coughlin provided no answer. However, Defendant Coughlin did acknowledge that "since the second half of 2022 into 2023, we've seen strong double digit growth in the value brand."

120.   Similarly, a UBS analyst asked how Petco could "prevent this from becoming a race to the bottom," and whether the "decision to add value brands [was] due to [the Company's perception that [it was] losing market share." Defendant Coughlin replied by citing cat products as an example, stating that "in many instances, you have finicky cats who only eat one brand or only one flavor, and we're now expanding to those brands, and

it's a matter of meeting those needs." Defendant Coughlin further elaborated, stating that "50% of [the Company's] services customers don't buy food" and that "a lot of instances is because they have a cat who has a certain product or they're more value conscious." Furthermore, Defendant Coughlin stated that "[i]f you have double digit growth in the value products, that means customers are looking for those products," and that the Company "want[s] to participate in that growth, not only from a share standpoint as you cite, but also to build [its] baskets and do the attach."

121.   This did not stymie the flow of questions from analysts regarding the sudden pivot towards value pet food products as opposed to the Company's previously much-heralded premium pet food products strategy. Defendant LaRose admitted, among other things, that the Company's focus on premium pet food products was failing as customers shifted "to [a] more value-seeking process – products and the associated promotional and pricing environment related to those products" which "happened a bit faster than [the Company had] anticipated." Defendant LaRose stated that this represented the "largest driver" of "the overall profit change in the guidance," and that Petco was dealing with the negative impact of the resultant higher inventory levels. Defendant LaRose further clarified that these higher levels "had increased as value product came in faster and at larger scale than [Petco] anticipated."

122.   On this news, the price per share of the Company's common stock fell $1.11 per share, or approximately 29%, from $3.83 on November 28, 2023 to close at $2.73 on November 29, 2023. Because the Individual Defendants continued to conceal the full truth regarding the material representations alleged herein, the price per share of the Company's common stock remained artificially inflated. Specifically, Defendants continued to make false and/or misleading statements and/or failed to disclose that, *inter alia* (1) Petco's Pandemic-related tailwinds were unsustainable; (2) Petco's premium/high-grade pet food business model was likewise unsustainable; (3) the scope and severity of the foregoing was such that mitigation and correction would be very expensive and thus negatively impact

Petco's sale metrics; (4) Petco's ability to deliver sustainable and profitable growth was overstated; and (5) as a result of the foregoing, the Individual Defendants' public statements were materially false and/or misleading at all relevant times.

### March 13, 2024 Press Releases

123. On March 13, 2024, the Company issued a press release before the opening of markets announcing that Defendant "Coughlin ha[d] stepped down as Petco's [CEO], Chairman, and member of the Board," and that Defendant Mohan had been appointed as Petco's interim CEO (the "Coughlin Press Release").

124. That same day, March 13, 2024, also prior to the opening of the markets, the Company issued a second press release, announcing its financial results for the fourth quarter of Fiscal Year 2023 and the entirety of Fiscal Year 2023 (the "Fiscal Year 2023 Press Release"). The Fiscal Year 2023 Press Release, *inter alia*, disclosed that "[c]omparable sales declined 0.9 percent year over year" during the fourth quarter of 2023, and that the Company had witnessed a "GAAP net loss of $1.3 billion, or $4.78 per share, which includes goodwill impairment of $1.2B."

### March 13, 2024 Earnings Call

125. The same day, on March 13, 2024, also prior to the opening of the markets, Petco hosted an earnings call with analysts and investors to discuss its financial results for the fourth quarter of Fiscal Year 2023 and the entirety of Fiscal Year 2023 (the "Fiscal Year 2023 Earnings Call"). During the Fiscal Year 2023 Earnings Call, Defendant Mohan acknowledged that the Company's premium, healthy, pet food business model was ***not*** sustainable, and could not withstand the larger ongoing trend in consumer preference towards cheaper pet products. Defendant Mohan also admitted during the Fiscal Year 2023 Earnings Call that the Defendants could not fix this issue by simply reintroducing lesser quality foods in the Company's product lineup. In relevant part, discussing these issues, Defendant Mohan stated:

I recognize, we have not been executing the way we need to, in a number of areas, to deliver on our full potential. Most critically, we have not adapted quickly enough, to recent changes in consumer preferences.

* * *

As a result, our in-store and omni-channel offering, was not appropriately aligned, with our customers' needs. This has led to two fundamental problems that, we need to address with speed. One, an erosion of market share as customers sought out alternatives, and two, a significant decline in profitability. Our work here, has already begun, with the reintroduction of value brands, in our consumable business, and adjusting our discretionary offering, to provide more balanced price points.

But simply reintroducing these products into our assortment is not enough. This more balanced assortment, must be supported with stronger retail and online customer experiences, and more disciplined execution. This starts with effective marketing to both existing, and potential customers. It builds with strong in-store and online merchandising. It is further supported by the education of Petco partners, to ensure they can effectively sell our complete offering.

And finally, it needs to be supported, by effective supply chain management that delivers inventory profitability with high-end stocks across our store base, and efficient delivery to omni-channel customers. Going beyond these critical near-term actions, we have to engage pet parents more effectively. We are focused on executing against high-quality, top-of-funnel customer acquisition and long-term retention, so more customers benefit, from the full Petco offering.

126.    Defendant Mohan nonetheless attempted to reassure investors by stating that "[i]mproving [the Company's] customer experience, retail execution, and overall cost structure, will help [the Company] drive profit stabilization in the near-term, and growth in the medium and long-term." However, Defendant Mohan did *not* disclose the anticipated negative impact such actions would have on the comparable sales metric Petco prized.

127.    On this news, the price per share of the Company's common stock fell $0.50 per share, or approximately 20%, from $2.56 on March 13, 2024 to close at $2.06 on March

14, 2024. Because Defendants continued to conceal the full truth regarding the material representations alleged herein, the price per share of the Company's common stock remained artificially inflated. Specifically, Defendants continued to make false and/or misleading statements and/or failed to disclose that, *inter alia* (1) Petco's Pandemic-related tailwinds were unsustainable; (2) Petco's premium/high-grade pet food business model was likewise unsustainable; (3) the scope and severity of the foregoing was such that mitigation and correction would be very expensive and thus negatively impact Petco's sale metrics; (4) Petco's ability to deliver sustainable and profitable growth was overstated; and (5) as a result of the foregoing, the Individual Defendants' public statements were materially false and/or misleading at all relevant times.

### April 3, 2024 Form 10-K

128.   On April 3, 2024, Petco filed its annual report on Form 10-K with the SEC (the "2023 10-K"). The 2023 10-K stated, in relevant part:

> The U.S. pet care industry is large, serving millions of households with pets, and has exhibited steady growth driven by an increase in the pet population and trends in pet humanization and premiumization. Due to the essential, repeat nature of pet care, the industry has demonstrated resilience across economic cycles. However, during fiscal 2023, we observed a softening in discretionary spend and shifting consumer preferences for more value-centric products associated with the current inflationary macroeconomic environment. In response to this shifting demand, during fiscal 2023, we broadened our assortment to include more national brands and implemented strategic pricing actions to offer more balanced price points in an effort to appeal to a broader base of consumers.

129.   The 2023 10-K included as attached exhibits SOX certifications which were signed by Defendants Mohan and LaRose.

### April 9, 2024: Petco Terminates its Chief Customer Officer

130.   On April 9, 2024, after the markets closed, Petco filed a current report on Form 8-K with the SEC which disclosed that the Board had "approved the termination of employment of Darren MacDonald, the Company's Chief Customer Officer, effective as

of April 12, 2024."

131.    On this news, the price per share of the Company's common stock fell $0.04 per share, or approximately 2%, from $1.89 on March April 9, 2024 to close at $1.85 on April 10, 2024. Because Defendants continued to conceal the full truth regarding the material representations alleged herein, the price per share of the Company's common stock remained artificially inflated. Specifically, Defendants continued to make false and/or misleading statements and/or failed to disclose that, *inter alia* (1) Petco's Pandemic-related tailwinds were unsustainable; (2) Petco's premium/high-grade pet food business model was likewise unsustainable; (3) the scope and severity of the foregoing was such that mitigation and correction would be very expensive and thus negatively impact Petco's sale metrics; (4) Petco's ability to deliver sustainable and profitable growth was overstated; and (5) as a result of the foregoing, the Individual Defendants' public statements were materially false and/or misleading at all relevant times.

### May 31, 2024 Proxy Statement

132.    On May 31, 2024, the Company filed the 2024 Proxy Statement. Defendants Breitner, Simmons, Lake, Mohan, Stadler, Briggs, Chande, and Sullivan solicited the 2025 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

133.    The 2024 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) elect four Class I directors for 3-year terms; (2) approve on a non-binding, advisory basis, proposed executive compensation; and (3) ratify the appointment of EY as the Company's registered independent public accounting firm for Fiscal Year 2024.

134.    Regarding the Board's oversight functions, the 2024 Proxy Statement stated the following, in relevant part:

> Our board of directors is well-positioned to guide our strategy and oversee our operations as we adapt our business to the rapidly-changing retail industry and macroeconomic environment. We believe that an effective board should be made up of individuals who collectively provide an appropriate balance of

diverse occupational and personal backgrounds and perspectives, and who have a range of skills and expertise sufficient to provide guidance and oversight with respect to the Company's strategy and operations. As such, our board expects directors to be open and forthright, to develop a deep understanding of the Company's business, to exercise sound judgment in fulfilling their oversight responsibilities, to embrace Petco's values and culture, and to possess the highest levels of integrity.

135.   Regarding the Company's Code of Conduct, the 2024 Proxy Statement stated the following:

Our board adopted a Code of Business Conduct and Ethics relating to the conduct of our business by all of our employees, executive officers (including our principal executive officer and principal financial officer/principal accounting officer (or persons performing similar functions)) and directors. This code satisfies the requirement that we have a "code of conduct" under the Nasdaq and SEC rules and is available on our website at **ir.petco.com/corporate-governance/documents-and-charters.** To the extent required under the Nasdaq and SEC rules, we intend to disclose future amendments to certain provisions of this code, or waivers of such provisions, applicable to any of our executive officers or directors, on our website identified above.

136.   Defendants Breitner, Simmons, Lake, Mohan, Stadler, Briggs, Chande, and Sullivan caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) Petco's Pandemic-related tailwinds were unsustainable; (2) Petco's premium/high-grade pet food business model was unsustainable; (3) the scope and severity of the foregoing was such  that mitigation and correction would be very expensive and negatively impact Petco's sale metrics; (4) Petco's ability to deliver sustainable and profitable growth was overstated; and (5) as a result of the foregoing, the Individual Defendants' public statements were materially false and/or misleading at all relevant times.

137.   The 2024 Proxy Statement was also materially false and misleading because, despite assertions to the Contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make

the numerous false and/or misleading statements and omission alleged herein; and (2) failing to report violations of the Code of Conduct. Furthermore, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

138.    As a result of Defendants Breitner, Simmons, Lake, Mohan, Stadler, Briggs, Chande, and Sullivan causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendant Breitner as a Class I director, thereby allowing him to continue breaching his fiduciary duties to the Company; (2) approve on non-binding, advisory basis, the proposed executive compensation; and (3) ratify appointment of EY as registered independent public accounting firm for Fiscal Year 2024.

### *May 28, 2024: Further Executive Departures*

139.    On May 28, 2024, the Company announced after market hours that it was undergoing further "changes to [its] leadership team [to] accelerate Petco's initiatives to drive retail excellence as we execute on our operational reset," including the departure of the Company's Chief Operating Officer, the Company's Chief Merchandising Officer, and the Company's Chief Supply Chain Officer.

140.    On this news, the price per share of the Company's common stock fell $0.29 per share, or approximately 8%, from $3.42 on March 28, 2024 to close at $3.13 on March 29, 2024. Because Defendants continued to conceal the full truth regarding the material representations alleged herein, the price per share of the Company's common stock remained artificially inflated. Specifically, Defendants continued to make false and/or misleading statements and/or failed to disclose that, *inter alia* (1) Petco's Pandemic-related tailwinds were unsustainable; (2) Petco's premium/high-grade pet food business model was likewise unsustainable; (3) the scope and severity of the foregoing was such that mitigation and correction would be very expensive and thus negatively impact Petco's sale metrics; (4) Petco's ability to deliver sustainable and profitable growth was overstated; and

(5) as a result of the foregoing, the Individual Defendants' public statements were materially false and/or misleading at all relevant times.

### February 18, 2025: Defendant LaRose Steps Down

141.   On February 18, 2025, the Company announced after the close of markets that Defendant LaRose had stepped down as CFO and that the Board had appointed Defendant Simmons as the Company's new CFO.

142.   On this news, the price per share of the Company's common stock fell $0.04 per share, or approximately 1%, from $3.14 on February 18, 2025 to close at $3.10 on February 19, 2025. Because Defendants continued to conceal the full truth regarding the material representations alleged herein, the price per share of the Company's common stock remained artificially inflated. Specifically, Defendants continued to make false and/or misleading statements and/or failed to disclose that, *inter alia* (1) Petco's Pandemic-related tailwinds were unsustainable; (2) Petco's premium/high-grade pet food business model was likewise unsustainable; (3) the scope and severity of the foregoing was such that mitigation and correction would be very expensive and thus negatively impact Petco's sale metrics; (4) Petco's ability to deliver sustainable and profitable growth was overstated; and (5) as a result of the foregoing, the Individual Defendants' public statements were materially false and/or misleading at all relevant times.

### March 26, 2025 Press Release

143.   On March 26, 2025, the Company issued a press release announcing its financial results for the fourth quarter of Fiscal Year 2024, as well as the entirety of Fiscal Year 2024 (the "Q4 2024 Press Release"). The Q4 2024 Press Release quoted Defendant Anderson as stating in relevant part that the Company's "results in [Q4] demonstrate the progress we've made to return Petco to retail operating excellence." Defendant Anderson was further quoted as stating "I am confident our new leadership team is well-positioned to . . . set the business up for sustainable profitable growth."

### March 26, 2025 Earnings Call

144.    Also on March 26, 2025, the Company held an earnings call with analysts and investors to discuss its financial results for the fourth quarter of Fiscal Year 2024, as well as the entirety of Fiscal Year 2024 (the "Fiscal Year 2024 Earnings Call"). During the prepared remarks portion of the Fiscal Year 2024 Earnings Call, Defendant Anderson attempted to assuage investors' fears regarding the Company's financial health. Defendant Anderson stated that Defendants had "made great progress" in correcting the Company's inherently flawed business model and returning Petco to "sustainable, profitable growth." Defendant Anderson continued, stating, in relevant part:

> Let me now unpack in greater detail our long-term phased approach to delivering on Petco's full potential. Starting with Phase 1, which is well underway. Over the last six months, I have relentlessly focused on: one, improving the operating model; two, giving our stores a voice; and three, restoring our retail fundamentals. Quite frankly, our foundational practices were not those of a successful consumer business and needed overhauling. We have made great progress on all three and are strengthening the foundation for Petco to return to sustainable,
> profitable growth.

145.    Defendant Anderson provided further insight into the Company's business processes at this time, stating, in relevant part:

> [W]e've conducted a detailed review of our product assortment, and our optimizing it to more closely align to consumer demand and preferences. Specifically, we are allocating more of our focus in shelf space to top-selling brands and high velocity SKUs across categories. In addition, we're continuing to sharpen our approach to pricing and have established a strategic pricing framework by category. This allows us to offer quality across the value spectrum with competitive price points, while also protecting margins.
>
> * * *
>
> As part of our pricing work, we have refocused our promotional strategy to move away from low margin revenue and toward more impactful targeted opportunities. We are now executing more targeted promotions and seeing favorable initial results.

146.   During the prepared remarks portion of the Fiscal Year 2024 Earnings Call, Defendant Simmons also addressed the change in Petco's business strategy. Specifically, Defendant Simmons stated that the Company "will no longer chase sales at the expense of margin." Thus, Defendant Simmons stated, "for the full year, we expect overall net sales to be down low-single digits [compared] to last year." Defendant Simmons, however, was silent as to the impact this shift in strategy would have upon Petco's comparable sales. Defendant Simmons downplayed this by attributing the "low-single digits" decrease to the Company's intent to close "25 net locations in 2024" and the closure of "between 20 to 30 net locations" in 2025.

147.   During the Q&A portion, Defendant Anderson addressed a question from a UBS analyst as to whether "the message is, we are willing to sacrifice some sales and market share, at least in the short run to improve the profitability and establish the foundation for the long-run." In doing so, Defendant Anderson confirmed that this was a correct interpretation. The UBS analyst continued, stating that it "look[ed] like [Petco's] guidance for this year is embedding an expectation that your comp[arable sales] are flat to, to maybe slightly negative." The UBS analyst thus questioned Defendants whether "at some point, do you run the risk of touching customer-facing activities that could result in, it be more challenging to return to growth when that phase will occur?" Defendant Simmons responded to this question, stating in relevant part:

> We are absolutely customer-focused. And part of this whole foundation building that we're talking about in 2025, which is so critical before we, sort of turn even more of our focus to regrowth is really making sure that we are addressing our customer needs.
>
> * * *
>
> There are so many areas to go after that don't touch our customer with in no way harm our customer experience. That's our number one goal is to please our customer.

148.    Defendant Anderson responded to the same question, attempting to downplay fears that the shift in strategy would harm comparable sales. Defendant Anderson stated, in relevant part:

> [D]on't look too far deep into that, because we shared with you we closed 25 stores last year. Most of those happened right at the end of the fourth quarter and then closing 20 to 30 this year, that right there just adds up to a couple of points of decline. And those were -- obviously, we wouldn't be closing those stores if they were profitable. So a lot of the improved EBITDA comes just from removing some stores that were dragging us backwards. But I think, [Defendant Simmons], you outlined it perfectly.

149.    As the Q&A portion of the call continued, other analysts also attempted to get a clearer picture on the impact that the shift in business strategy would have on the Company's comparable sales. These efforts were, however, thwarted. A Morgan Stanely analyst enquired whether "you can share what's implied comp," "what does the industry do in [20]25, because it looks like it's growing slightly again,"  and "if it ends up being better or what kind of assumptions that you're building in such that you can get comp to positive?" Defendant Anderson responded, in relevant part, as follows:

> Yeah. Look, our assumption on it is that we're not waiting for the industry to recover. This 2025 is a self-help year for Petco, and we can clearly deliver on what we shared with you today by driving internal, operational and profit improvements that are not dependent on the industry. So, like other things, [Defendant Simmons] shared, if the industry grows and we take our fair share, that's another tailwind for us.

150.    Defendant Simmons also addressed the Morgan Stanley analyst's questions, stating in relevant part:

> Yeah. And just to underscore that, with the guidance down low single digits on sales, that's a range. We're not counting on a positive comp to achieve our adjusted EBITDA guidance. But there again, if it comes and we welcome all customers, if it comes, great, it's just a tailwind.

***March 31, 2025 Form 10-K***

151.    On March 31, 2025, the Company filed on Form 10-K with the SEC its annual report for the year 2024 (the "2024 10-K"). The 2024 10-K stated, in relevant part:

> [D]uring fiscal 2024, we continued to observe softening discretionary spending and shifts in consumer preferences for more value-centric products associated with the current inflationary environment, macroeconomic and political uncertainty and increased competition. In response to this shifting demand, we have broadened our assortment to include more national brands, and implemented strategic pricing and promotional actions to offer more balanced price points in an effort to appeal to a broader base of consumers. In connection with these efforts, in late fiscal 2024 we also began efforts to optimize our assortment and store labor model, and take costs out of all areas of our business in an effort to enhance our profitability and drive performance.

152.    Furthermore, the 2024 10-K featured appended SOX certifications signed by Defendants Anderson and Simmons.

153.    The statements referenced in ¶¶ 143-152 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) Petco's Pandemic-related tailwinds were unsustainable; (2) Petco's premium/high-grade pet food business model was unsustainable; (3) the scope and severity of the foregoing was such that mitigation and correction would be very expensive and negatively impact Petco's sale metrics; (4) Petco's ability to deliver sustainable and profitable growth was overstated; and (5) as a result of the foregoing, the Individual Defendants' public statements were materially false and/or misleading at all relevant times.

## THE TRUTH FULLY EMERGES

154.    On June 5, 2025, the Company issued the Q1 2025 Press Release. The Q1 2025 Press Release reported, among other things, a net sales total of $1.5 billion—a year-over-year decline of *2.3%*, as well as a *1.3% decline in comparable sales*. The decline in net sales was largely in keeping with market expectations. However, the decline in comparable sales was significantly larger than anticipated.

155.    In response to this, a June 5, 2025 *Wall Street Journal* article entitled "Petco Same-Store Sales Miss Expectations Amid Sluggish Turnaround Efforts" stated, in relevant part:

> Petco . . . posted a wider-than-expected loss in same-store sales for the first quarter as its turnaround plan continues to ramp up.
>
> The pet-products retailer said Thursday same-store sales declined 1.3%, compared with a 0.6% decline estimated by Wall Street. The drop was driven by fewer transactions despite Petco's efforts to boost foot traffic in its stores, management said.
>
> The miss comes as [Defendant] Anderson, who started last summer, aims to steer the company back to profitability. He wants to improve merchandise and capitalize on growth opportunities like in-store grooming and veterinarian services. Anderson told analysts on a call the fruits of his labor aren't yet visible in Petco's finances.

156.    Analysts were also concerned about Petco's diminishing sales and market share, particularly in light of the Defendants' attempts to improve the Company's financial performance. An Evercore ISI analyst stated that the "next step of getting back to topline growth needs to follow soon, before share losses get too much to recover." A Morgan Stanely analyst expressed similar sentiment, stating that "we think upside from here is shaped by comp acceleration and sustainable revenue growth, which is likely pushed out to at least [20]26."

157.    On this news, the price per share of the Company's common stock fell $0.84 per share, or approximately 23%, from closing at $3.62 per share on June 5, 2025 to close at $2.78 per share on June 6, 2025.

## **DAMAGES TO PETCO**

158.    As a direct and proximate result of the Individual Defendants' misconduct, Petco has lost and will continue to lose and expend many millions of dollars.

159.    Such expenditures include, but are not limited to, legal fees, costs, and any

payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

160.  Such expenditures will also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

161.  Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

162.  Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

163.  As a direct and proximate result of the Individual Defendants' conduct, Petco has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## **DERIVATIVE ALLEGATIONS**

164.  Plaintiff brings this action derivatively and for the benefit of Petco to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Petco, violations of the Exchange Act, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets.

165.  Petco is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

166.  Plaintiff is, and has been at all relevant times, a shareholder of Petco. Plaintiff

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

will adequately and fairly represent the interests of Petco in enforcing and prosecuting his rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

167.   Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

168.   A pre-suit demand on the Board of Petco is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following ten individuals: Defendants Anderson, Mohan, Breitner, Briggs, Chande, Stadler, and Sullivan (the "Director-Defendants"), along with nonparties Glenn Murphy, Iris Yen, and David Lubek (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the ten Directors who are on the Board at the time this action is commenced.

169.   Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and/or misleading statements and/or omissions of material facts. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

170.   In addition, the Director-Defendants caused the 2023 Proxy Statement to call for a shareholder vote to approve the Amended Incentive Plan, which increased the amount of shares available under the Incentive Plan by 15.5 million shares. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the Amended Incentive Plan, which they would not have approved had they been informed about the Individual Defendants' misconduct. Prior to the Company's 2023 Annual Meeting of Stockholders on June 22, 2023, there were 4,807,178 shares available for distribution under the Incentive Plan. After the shareholder voted to approve the Amended

Incentive Plan, there were an additional 15.5 million shares available for issuance under the Amended Incentive Plan. Thus, the Individual Defendants, including the Director-Defendants, received material personal benefits that they otherwise would not receive but for the issuance of the false and misleading 2023 Proxy Statement and the shareholders approving the Amended Incentive Plan. For these reasons too, demand on the Director-Defendants is futile and, therefore, excused.

171.   Additional reasons that demand on Defendant Anderson is futile follow. Defendant Anderson has served as Petco's CEO and as a Company director since July 29, 2024. The Company provides Defendant Anderson with his principal occupation, for which he receives lucrative compensation. Thus, as the Company admits, Defendant Anderson is not an independent director. As the Company's highest officer and a trusted Company director, Defendant Anderson conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Furthermore, Defendant Anderson signed the false and misleading 2023 10-K and the SOX certifications attached as exhibits thereto. Defendant Anderson is also named as a defendant in the Securities Class Action. For these reasons, Defendant Anderson breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

172.   Additional reasons that demand on Defendant Mohan is futile follow. Defendant Mohan has served as a Company director since March 2021, and additionally serves as the Chairman of the Compensation Committee. Defendant Mohan, furthermore, was the Company's interim CEO from March 13, 2024 to July 29, 2024, during which time the Company provided Defendant Mohan with his principal occupation, for which he

received lucrative compensation. As a trusted Company director, and having at one time been the Company's highest officer, Defendant Mohan conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Furthermore, Defendant Mohan signed the false and/or misleading SOX certifications attached as exhibits to the 2024 10-K. Additionally, Defendant Mohan signed the false and/or misleading 2020 10-K, 2021 10-K, 2022 10-K, and 2023 10-K. Defendant Mohan also solicited the 2023 Proxy Statement, which contained false and misleading information contributing, *inter alia*, to shareholders voting to reelect Defendants Briggs, Chande, and Sullivan as Class III directors, allowing them to continue to breach their fiduciary duties to the Company. Furthermore, Defendant Mohan also solicited the 2024 Proxy Statement, which contained false and misleading information contributing, *inter alia*, to shareholders voting to reelect Defendant Breitner as a Class I director, allowing him to continue to breach his fiduciary duties to the Company. Additionally, Defendant Mohan, as a Company director, benefits materially from the increased number of shares made available for payment under the Amended Incentive Plan which stockholders approved on the basis of the materially false and/or misleading 2023 Proxy Statement. Defendant Mohan also conducted multiple sales of Company common stock on material non-public information, selling approximately 104,642 shares for approximate total proceeds of $366,555 while said common stock traded at artificially inflated prices as a result of the scheme to issue materially false and misleading statements. Defendant Mohan is also named as a defendant in the Securities Class Action. For these reasons, Defendant Mohan breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

173.    Additional reasons that demand on Defendant Breitner is futile follow. Defendant Breitner has served as a Company director since 2016, and is the Chairman of the Board's Audit Committee. Defendant Breitner receives handsome compensation from the Company for his role as a director. As a trusted Company director, Defendant Breitner conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Furthermore, Defendant Breitner signed the materially false and/or misleading 2020 10-K, 2021 10-K, 2022 10-K, and 2023 10-K. Defendant Breitner also solicited the 2023 Proxy Statement, which contained false and misleading information contributing, *inter alia*, to shareholders voting to reelect Defendants Briggs, Chande, and Sullivan as Class III directors, allowing them to continue to breach their fiduciary duties to the Company. Additionally, Defendant Breitner solicited the 2024 Proxy Statement, which contained false and misleading information contributing, *inter alia*, to shareholders voting to reelect Defendant Breitner as a Class I director, allowing him to continue to breach his fiduciary duties to the Company. Additionally, Defendant Breitner, as a Company director, benefits materially from the increased number of shares made available for payment under the Amended Incentive Plan which stockholders approved on the basis of the materially false and/or misleading 2023 Proxy Statement. Finally, Defendant Breitner has served as a Senior Advisor at CVC since February 2024, and previously as a Managing Partner of CVC from 2007 until 2024. CVC exercises, along with CPP, through Scooby, indirect control of Petco by virtue of its 66% control of voting power for director elections. For these reasons, Defendant Breitner breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

174. Additional reasons that demand on Defendant Briggs is futile follow. Defendant Briggs has served as a Company director since 2018, and serves additionally as a member of the Audit Committee and the Chairman of the Nominating and Corporate Governance Committee. He also receives handsome compensation from the Company for his role as a director. As a trusted Company director, Defendant Briggs conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Furthermore, Defendant Briggs signed the materially false and/or misleading 2020 10-K, 2021 10-K, 2022 10-K, and 2023 10-K. Defendant Briggs also solicited the 2023 Proxy Statement, which contained false and misleading information contributing, *inter alia*, to shareholders voting to reelect Defendants Briggs, Chande, and Sullivan as Class III directors, allowing them to continue to breach their fiduciary duties to the Company. Additionally, Defendant Briggs solicited the 2024 Proxy Statement, which contained false and misleading information contributing, *inter alia*, to shareholders voting to reelect Defendant Breitner as a Class I director, allowing him to continue to breach his fiduciary duties to the Company. Additionally, Defendant Briggs, as a Company director, benefits materially from the increased number of shares made available for payment under the Amended Incentive Plan which stockholders approved on the basis of the materially false and/or misleading 2023 Proxy Statement. For these reasons, Defendant Briggs breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

175. Additional reasons that demand on Defendant Chande is futile follow. Defendant Chande has served as a Company director since 2016, and serves additionally as a member of the Nominating and Corporate Governance Committee. He also receives

handsome compensation from the Company for his role as a director. As a trusted Company director, Defendant Chande conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Furthermore, Defendant Chande signed the materially false and/or misleading 2020 10-K, 2021 10-K, 2022 10-K, and 2023 10-K. Defendant Chande also solicited the 2023 Proxy Statement, which contained false and misleading information contributing, *inter alia*, to shareholders voting to reelect Defendants Briggs, Chande, and Sullivan as Class III directors, allowing them to continue to breach their fiduciary duties to the Company. Furthermore, Defendant Chande also solicited the 2024 Proxy Statement, which contained false and misleading information contributing, *inter alia*, to shareholders voting to reelect Defendant Breitner as a Class I director, allowing him to continue to breach his fiduciary duties to the Company. Additionally, Defendant Chande, as a Company director, benefits materially from the increased number of shares made available for payment under the Amended Incentive Plan which stockholders approved on the basis of the materially false and/or misleading 2023 Proxy Statement. Finally, Defendant Chande is Partner, U.S. Head of Consumer and Co-Head of Business Services at CVC, which he joined in 2016. CVC exercises, along with CPP, through Scooby, indirect control of Petco by virtue of its 66% control of voting power for director elections. For these reasons, Defendant Chande breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

176.    Additional reasons that demand on Defendant Stadler is futile follow. Defendant Stadler has served as a Company director since 2016. He also receives handsome compensation from the Company for his role as a director. As a trusted Company

director, Defendant Stadler conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Furthermore, Defendant Stadler signed the materially false and/or misleading 2020 10-K, 2021 10-K, 2022 10-K, and 2023 10-K. Defendant Stadler also solicited the 2023 Proxy Statement, which contained false and misleading information contributing, *inter alia*, to shareholders voting to reelect Defendants Briggs, Chande, and Sullivan as Class III directors, allowing them to continue to breach their fiduciary duties to the Company. Furthermore, Defendant Stadler also solicited the 2024 Proxy Statement, which contained false and misleading information contributing, *inter alia*, to shareholders voting to reelect Defendant Breitner as a Class I director, allowing him to continue to breach his fiduciary duties to the Company. Additionally, Defendant Stadler, as a Company director, benefits materially from the increased number of shares made available for payment under the Amended Incentive Plan which stockholders approved on the basis of the materially false and/or misleading 2023 Proxy Statement. Finally, Defendant Stadler is a Managing Partner at CVC, which he joined in 2007. CVC exercises, along with CPP, through Scooby, indirect control of Petco by virtue of its 66% control of voting power for director elections. For these reasons, Defendant Stadler breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

177. Additional reasons that demand on Defendant Sullivan is futile follow. Defendant Sullivan has served as a Company director since 2021, and serves additionally as a member of the Compensation Committee. She also receives handsome compensation from the Company for her role as a director. As a trusted Company director, Defendant Sullivan conducted little, if any, oversight of the Company's engagement in the scheme to

make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, she failed to correct the false and misleading statements alleged herein. Furthermore, Defendant Sullivan signed the materially false and/or misleading 2020 10-K, 2021 10-K, 2022 10-K, and 2023 10-K. Defendant Sullivan also solicited the 2023 Proxy Statement, which contained false and misleading information contributing, inter alia, to shareholders voting to reelect Defendants Briggs, Chande, and Sullivan as Class III directors, allowing them to continue to breach their fiduciary duties to the Company. Furthermore, Defendant Sullivan also solicited the 2024 Proxy Statement, which contained false and misleading information contributing, inter alia, to shareholders voting to reelect Defendant Breitner as a Class I director, allowing him to continue to breach his fiduciary duties to the Company. Additionally, Defendant Sullivan, as a Company director, benefits materially from the increased number of shares made available for payment under the Amended Incentive Plan which stockholders approved on the basis of the materially false and/or misleading 2023 Proxy Statement. Finally, Defendant Sullivan is Senior Managing Director & Chief Talent Officer at CPP, which she joined in 2015. CPP exercises, along with CVC, through Scooby, indirect control of Petco by virtue of its 66% control of voting power for director elections. For these reasons, Defendant Sullivan breached her fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

178.    Additional reasons that demand on the Board is futile follow.

179.    Defendants Breitner and Briggs, (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit

Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violation of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

180.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Conduct and applicable laws, rules, and regulations. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

181.    Petco has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Petco any part of the damages Petco suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

182.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad

faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

183.   The acts complained of herein constitute violations of fiduciary duties owed by Petco's officers and directors, and these acts are incapable of ratification.

184.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the shareholders of Petco. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Petco, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

185.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Petco to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

186.   Thus, for all of the reasons set forth above, all of the Director-Defendants,

and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

187.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

188.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

189.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

190.    Defendants Briggs, Chande, Sullivan, Coughlin,  Breitner, Simmons, Lake, Mohan, and Stadler caused the 2023 Proxy Statement to be false and/or misleading by failing to disclose, *inter alia*, that: (1) Petco's Pandemic-related tailwinds were unsustainable; (2) Petco's premium/high-grade pet food business model was unsustainable; (3) the scope and severity of the foregoing was such  that mitigation and correction would

be very expensive and negatively impact Petco's sale metrics; (4) Petco's ability to deliver sustainable and profitable growth was overstated; and (5) as a result of the foregoing, the Individual Defendants' public statements were materially false and/or misleading at all relevant times.

191. Moreover, the 2023 Proxy Statement failed to disclose that the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and/or misleading statements and omission alleged herein; and (2) failing to report violations of the Code of Conduct. Furthermore, the 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

192. Defendants Briggs, Chande, Sullivan, Coughlin, Breitner, Simmons, Lake, Mohan, and Stadler knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement, including but not limited to, the re-election of directors.

193. As a result of Defendants Briggs, Chande, Sullivan, Coughlin, Breitner, Simmons, Lake, Mohan, and Stadler causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, approve the Amended Incentive Plan, and to re-elect Defendants Briggs, Chande, and Sullivan as Class III directors, thereby allowing them to continue breaching their fiduciary duties to the Company.

194. The Company was damaged as a result of Defendants Briggs, Chande, Sullivan, Coughlin, Breitner, Simmons, Lake, Mohan, and Stadler's material misrepresentations and omissions in the 2023 Proxy Statement.

195. Furthermore, Defendants Breitner, Simmons, Lake, Mohan, Stadler, Briggs, Chande, and Sullivan caused the 2024 Proxy Statement to be false and/or misleading by

failing to disclose, *inter alia*, that: (1) Petco's Pandemic-related tailwinds were unsustainable; (2) Petco's premium/high-grade pet food business model was unsustainable; (3) the scope and severity of the foregoing was such that mitigation and correction would be very expensive and negatively impact Petco's sale metrics; (4) Petco's ability to deliver sustainable and profitable growth was overstated; and (5) as a result of the foregoing, the Individual Defendants' public statements were materially false and/or misleading at all relevant times.

196. Moreover, the 2024 Proxy Statement failed to disclose that the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and/or misleading statements and omission alleged herein; and (2) failing to report violations of the Code of Conduct. Furthermore, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

197. Defendants Breitner, Simmons, Lake, Mohan, Stadler, Briggs, Chande, and Sullivan knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement, including but not limited to, the re-election of directors.

198. As a result of Defendants Breitner, Simmons, Lake, Mohan, Stadler, Briggs, Chande, and Sullivan causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to re-elect Defendant Breitner as a Class I director, thereby allowing him to continue breaching his fiduciary duties to the Company.

199. The Company was damaged as a result of Defendants Breitner, Simmons, Lake, Mohan, Stadler, Briggs, Chande, and Sullivan's material misrepresentations and omissions in the 2024 Proxy Statement.

200.   Plaintiff, on behalf of Petco, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

201.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

202.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Petco's business and affairs.

203.   Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

204.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Petco.

205.   In breach of their fiduciary duties owed to Petco, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) Petco's Pandemic-related tailwinds were unsustainable; (2) Petco's premium/high-grade pet food business model was unsustainable; (3) the scope and severity of the foregoing was such that mitigation and correction would be very expensive and negatively impact Petco's sale metrics; (4) Petco's ability to deliver sustainable and profitable growth was overstated; and (5) as a result of the foregoing, the Individual Defendants' public statements were materially false and/or misleading at all relevant times.

206.   In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

207.   Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

208.   In yet further breach of their fiduciary duties, four of the Individual Defendants engaged in lucrative insider sales of Company common stock, netting combined proceeds of approximately $6.93 million.

209.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Petco's securities.

210.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Petco's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

211.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

212.   As a direct and proximate result of the Individual Defendants' breaches of

their fiduciary obligations, Petco has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

213.  Plaintiff, on behalf of Petco has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Unjust Enrichment

214.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

215.  By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Petco.

216.  The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Petco that was tied to the performance or artificially inflated valuation of Petco, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

217.  Plaintiff, as a shareholder and representative of Petco, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, payments to the Individual Defendants, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

218.  Plaintiff, on behalf of Petco, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Abuse of Control

219.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

220.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Petco, for which they are legally responsible.

221.   As a direct and proximate result of the Individual Defendants' abuse of control, Petco has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Petco has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

222.   Plaintiff, on behalf of Petco, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

223.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

224.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Petco in a manner consistent with the operations of a publicly-held corporation.

225.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Petco has sustained and will continue to sustain significant damages.

226.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

227.   Plaintiff, on behalf of Petco, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

228.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

229.   The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees to the detriment of the shareholders and the Company.

230.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Petco to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

231.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

232.   Plaintiff, on behalf of Petco, has no adequate remedy at law.

## SEVENTH CLAIM
**Against Defendants Anderson, Mohan, Coughlin, Simmons, LaRose, and Nuzzo for Contribution Under Sections 10(b) and 21D of the Exchange Act**

233.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

234.   Petco and Defendants Anderson, Mohan, Coughlin, Simmons, LaRose, and Nuzzo are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Anderson, Mohan, Coughlin, Simmons, LaRose, and Nuzzo's willful and/or reckless violations of their obligations as officers and/or directors of Petco.

235.   Defendants Anderson, Mohan, Coughlin, Simmons, LaRose, and Nuzzo,

because of their positions of control and authority as officers and/or directors of Petco, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Petco, including the wrongful acts complained of herein and in the Securities Class Action.

236. Accordingly, Defendants Anderson, Mohan, Coughlin, Simmons, LaRose, and Nuzzo are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

237. As such, Petco is entitled to receive all appropriate contribution or indemnification from Defendants Anderson, Mohan, Coughlin, Simmons, LaRose, and Nuzzo.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Petco, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Petco;

(c) Determining and awarding to Petco the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Petco and the Individual Defendants to take all necessary actions to reform and improve Petco's corporate governance and internal procedures to comply with applicable laws and to protect Petco and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for

shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

      1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      2. a provision to permit the shareholders of Petco to nominate at least five candidates for election to the Board;

      3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

    (e)    Awarding Petco restitution from Individual Defendants, and each of them;

    (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    (g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: August 1, 2025        Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/*Robert C. Moest                    .
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Attorneys for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## <u>VERIFICATION</u>

      I, Danielle Miller, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

      I declare under penalty of perjury that the foregoing is true and correct.  Executed this 30 day of __July__ , 2025.

Signed by:

*Danielle Miller*

9481EADAA007494...

Danielle Miller